

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-23-1995

# United States v Coyle

Precedential or Non-Precedential:

Docket 94-2208

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"United States v Coyle" (1995). *1995 Decisions.* Paper 233.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/233

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


NO. 94-2208


UNITED STATES OF AMERICA

v.

MICHAEL C. COYLE,

Appellant


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 93-cr-00329)


Argued July 17, 1995

Before:  SLOVITER, Chief Judge, SCIRICA, Circuit Judge,
and AMBROSE, District Judge[298]

(Filed August 23, 1995)


Elizabeth K. Ainslie (Argued)
Ainslie & Bronson
Philadelphia, PA 19107

        Attorney for Appellant

Robert E. Goldman
Tammy E. Avery (Argued)
Office of United States Attorney
Philadelphia, PA 19106

        Attorneys for Appellee


1

SLOVITER, Chief Judge.

Michael C. Coyle appeals his conviction and sentence on three counts of mail fraud, 18 U.S.C. § 1341, five counts of making false statements on documents required by ERISA, 18 U.S.C. § 1027, and two counts of blackmail, 18 U.S.C. § 873.

## I.

### Facts and Procedural Background

Michael C. Coyle was the Chief Financial Officer for Health Corporation of America (HCA) from December 1986 through October 1990. HCA, a publicly traded corporation, was in the business of designing, operating and administering medical, dental and vision care plans. It had two subsidiaries: the North American Dental Administrators (NADA) and the Cytex Corporation. Through the assistance of Larry Smith, the principal of Eastern State Casualty Associates, HCA was awarded three contracts by the United Paper Convertors Local 286 Welfare Trust Fund to administer plans providing health care benefits to members of the Paper Convertors Local 286. These are employee benefit plans subject to Title I, as amended, of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1145. The duration of these particular contracts is unclear from the record although it appears that the contracts were renewed prior to their eventual termination in 1990.

NADA administered the Fund's dental plans for members in New Jersey (New Jersey dental plan). Cytex administered the

2

Fund's dental plan for members in Pennsylvania and Delaware (referred to here as the Pennsylvania dental plan). A division of Cytex, National Vision Plan (NVP), administered the Fund's vision care plan. The companies will be referred to collectively as HCA.

HCA received monthly premiums from the Fund, which were calculated at a fixed rate per covered employee per month, and HCA made the payments to participating physicians, dentists and laboratories. The Pennsylvania dental contract covered about 2700 members while the New Jersey dental contract covered about 300. Under the contracts covering the vision care plan and the New Jersey dental plan, all premium payments not disbursed to participating physicians or laboratories or retained as administrative costs were to be returned to the Fund. There was no similar provision for refund of surplus premiums in the Pennsylvania dental contract although the contracts appear to have functioned similarly in all respects. In particular, there was no refund of any premiums under any of the contracts.

All three contracts contained provisions for assuring disclosure to and record inspection by the Fund, and required HCA to prepare and submit to the Fund annual reports containing complete and accurate accounting of all funds received and disbursements made.

Under ERISA, the Fund was required to file a federal Form 5500, also referred to as the "annual report," showing financial information of, inter alia, assets and liabilities, income and expenses, including the amounts and purposes of

3

disbursements and money retained.  See 29 U.S.C. § 1023.  Form 5500 is filed with the Internal Revenue Service which provides copies to the Department of Labor and the Pension Benefit Guaranty Corporation.  Schedules A, attached to Form 5500, must be filed for every defined benefit plan when any benefits are "purchased from and guaranteed by an insurance company, insurance service, or other similar organization."  29 U.S.C. § 1023(e). In addition, ERISA obliges "an insurance carrier or other organization which provides some or all of the benefits under the plan, or holds assets of the plan" to transmit and certify certain information to the plan administrator, here the Fund, to assist in its preparation of the annual report.  See 29 U.S.C. §1023(a)(2)(A).  The information received by the Fund must be maintained publicly.  29 U.S.C. § 1026(a).

It was Coyle's responsibility to approve all disbursements to service providers on behalf of the Fund and to prepare or to direct the preparation of the financial reports submitted to the Fund.  Pursuant to the Fund's request, Coyle prepared or supervised the preparation of the Schedules A for 1986, 1987 and 1988 which HCA transmitted to the Fund's accountants for inclusion with the federal Forms 5500.

Joseph R. Cusumano, the Chief Executive Officer of HCA until 1990, devised a scheme whereby HCA would conceal the true amount of disbursements and administrative costs, and thereby retain as administrative retention a higher amount than reported to the Fund or than permissible under at least some of the contracts and under New Jersey law.  See Dental Plan Organization

4

Act, N.J. Stat. Ann. §§ 17:48D-1 to 17:48D-24 (West 1985 and Supp. 1995).  In order to effectuate this scheme, Coyle prepared the Schedules A with false or distorted figures, overstating the amounts paid to medical service providers and understating the amounts retained by HCA.  Agent James L. Black, Department of Labor, Office of Labor Racketeering, testified that Coyle understated the amount of premiums retained by HCA by $84,000 in 1986, and $214,000 in 1987 and 1988.  The government's evidence shows an understatement of administrative retention by $298,000 during the relevant period.  Coyle does not contest that the figures provided by HCA were false or that he was responsible for submitting them falsely.

When the scheme was uncovered, Coyle was indicted on charges of mail fraud, false statements on documents required by ERISA, and blackmail of Cusumano.  By the time of Coyle's trial, Cusumano, who had been convicted by a jury in 1990 on a 49-count indictment for defrauding another welfare benefit plan, see United States v. Cusumano, 943 F.2d 305 (3d Cir. 1991), cert. denied, 502 U.S. 1036 (1992), was no longer involved with HCA. In fact, Cusumano testified for the prosecution at Coyle's trial in this case.  The jury returned a verdict against Coyle on all counts, and Coyle was sentenced to twenty-seven months incarceration with three years supervised release and restitution of $298,330.00.

On appeal, Coyle challenges the sufficiency of the evidence on the mail fraud counts, the propriety of the jury instructions on the false statements and blackmail counts, and

5

the district court's imposition of enhancements under the sentencing guidelines for abuse of trust and the amount of the fraud loss incurred by the Fund.

## II.

### Mail Fraud Conviction

Coyle first argues that the evidence with respect to the mail fraud was insufficient for the jury to find that he engaged in a scheme intended to defraud the Fund or that the mailings of the Schedules A were in furtherance of the fraudulent scheme. When the sufficiency of the evidence at trial is challenged, we must view the evidence in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80 (1942). A claim of insufficiency of evidence places a very heavy burden on the appellant. We must affirm the convictions if a rational trier of fact could have found defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence. United States v. Gonzalez, 918 F.2d 1129, 1132 (3d Cir. 1990), cert. denied, 498 U.S. 1107, and cert. denied, 499 U.S. 968, and cert. denied, 499 U.S. 982 (1991).

The mail fraud statute, 18 U.S.C. § 1341, proscribes any "scheme or artifice to defraud" in which the defendant participated with the specific intent to defraud and in which the mails were used "in furtherance of the fraudulent scheme." United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994). The scheme "need not be fraudulent on its face but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension."

6

United States v. Pearlstein, 576 F.2d 531, 535 (3d Cir. 1978) (citation omitted). Proof of specific intent is required, id. at 537, which "may be found from a material misstatement of fact made with reckless disregard for the truth." Hannigan, 27 F.3d at 892 n.1.

Coyle argues that the Fund was not induced to enter into these contracts by fraud. The issue before us is not whether there was fraud in the inducement of the contract, but whether Coyle intentionally engaged in a scheme by which the Fund was defrauded of premiums under the guise of administrative costs. There is sufficient evidence that there was such a scheme, and that Coyle knowingly participated in it.

There was testimony that the amounts reported on the Schedules A which Coyle prepared for the Fund did not accurately reflect the administrative costs retained and the amounts paid to providers. App. at 259-64. Cusumano, who was intimately involved in the scheme, testified that "we reported improperly, with my full knowledge, and kept more dollars for administration than we were supposed to where we were compelled to by the New Jersey contract and kept more dollars in Pennsylvania by not paying the dentists as many dollars as we were supposed to pay them, through various functions, we kept an excessive amount of dollars for administration so that we could keep the company going." App. at 54.

Cusumano also testified that Coyle was the HCA representative who dealt with the Fund. App. at 56. Moreover, it was Coyle who supervised the preparation of the Schedules A by

the HCA staff and he personally provided the figures for administrative costs. App. at 44.

HCA accountant Keith Geyer explained that, rather than following standard accounting procedures, Coyle set an amount to report for administrative retention and directed him to subtract that amount plus the amount of Smith's commissions from the premiums received to arrive at the amount HCA reported as "claims paid." Cusumano testified that a fair retention rate for administrative costs would have been at most in the low 20% of the total premiums received, App. at 60, and Alex Johns, a consultant hired by the Fund, testified that 10% was a fair rate. Agent Black produced documents evidencing that HCA's actual retention rate (including the amount paid in commissions) was between 30% and 70%. See App. at 251-64.

Coyle argues that the Fund Trustees were not deceived by HCA because they knew that HCA was not accounting to the Fund based on HCA's actual payments to the providers but was instead accounting to the Fund on the basis of the "usual, customary and reasonable" value of the providers' services. Coyle notes that although Johns had advised the Trustees that the Fund might be entitled to a refund from HCA and that it should cancel its contracts with HCA, the Fund did not take that advice. In addition, Coyle argues that the government failed to produce any evidence that the Fund Trustees reviewed the Schedules A.

To the extent that Coyle is arguing the Fund was negligent in ignoring Johns' advice and in failing to review the Schedules A, we reject the relevance of those allegations, even

8

if true. The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct. United States v. Kreimer, 609 F.2d 126, 132 (5th Cir. 1980). As Cusumano explained, the false reporting was necessary to the scheme to retain the excessive administrative costs, because the consequence of accurate reporting would have been that they "would have had to lower the price for the ensuing year" for that contract. App. at 54. As for the Fund's reliance, Jack Klein, the Fund's accountant, testified that he had no obligation to independently verify the validity of the figures provided by HCA and, therefore, did not do so. An employer trustee for the Fund, Theodore Seidenberg, who was later co-chair of Local 286's health and welfare and pension boards, testified that the Trustees would never have agreed to contract with HCA if they had known that HCA was withholding between 50% and 70% for administrative costs. App. at 165. A rational jury could infer that the Fund was deceived by the intentional actions of Coyle and his associates. Coyle's participation in HCA's unlawful activities by preparing the Schedules A or directing their preparation with false figures and the knowledge that the Schedules A would be sent to the Fund's accountant and, eventually, to the IRS fully supports the conclusion that he intended that the scheme's illicit objectives be achieved. Pearlstein, 576 F.2d at 541.

Coyle also contends that even if the three Schedules A on which the three mail fraud counts are predicated were intended to conceal HCA's true profits from the Fund, the mailings did not further the scheme. The three mailings which formed the basis of

9

the three mail fraud counts were a mailing of a Form 5500 with a Schedule A by the Fund to the IRS in 1987, (Count One), a mailing of a Schedule A by HCA to the Fund's accountant in 1988, (Count Two), and a mailing of a Form 5500 with the Schedule A by the Fund's accountant to the IRS in 1990, (Count Three).

The federal mail fraud statute reaches only the use of the mails when that mailing is part of the execution of a fraud. Schmuck v. United States, 489 U.S. 705, 710 (1989) (citing Kann v. United States, 323 U.S. 88, 95 (1944)).  However, the use of the mails need not be an essential element of the scheme.  Id. (citing Pereira v. United States, 347 U.S. 1, 8 (1954)).  It is sufficient if the mailings are "'incident to an essential part of the scheme' or 'a step in [the] plot.'"  Id. at 710-11 (quoting Badders v. United States, 240 U.S. 391, 394 (1916)).  We have held that the mailings must be sufficiently closely related to the scheme to bring the conduct within the ambit of the mail fraud statute, United States v. Lebovitz, 669 F.2d 894, 896 (3d Cir.), cert. denied, 456 U.S. 929 (1982), and the "scheme's completion [must] depend[] in some way on the charged mailings." United States v. Otto, 742 F.2d 104, 108 (3d Cir. 1984), cert. denied, 469 U.S. 1196 (1985).  Even mailings made after the fruits of the scheme have been received may come within the statute when they are "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place."  Id. (citation and quotation omitted).

10

In this case, there was a basis for the jury to conclude that the mailings induced the Fund Trustees to accept the accuracy of the financial figures on the Schedules A and made apprehension of HCA's fraudulent scheme less likely. There was sufficient evidence for the jury to infer that but for the mailings of the Schedules A with the false amounts HCA would have been unable to carry out its scheme either because the true figures would have prompted an investigation by the Department of Labor, see Transcript of Jury Trial, Dec. 1, 1993 (9:30 a.m.) at 103-16 (Testimony of Howard Hensley, Chief of Division of Reporting and Disclosure, Department of Labor), or because the Fund's accountants or consultant would have alerted the Fund to the amount of HCA's profit, see Transcript of Jury Trial, Dec. 1, 1993 (9:30 a.m.) at 25-55 (Testimony of Alex Johns), and Transcript of Jury Trial, Nov. 30, 1993 (9:30 a.m.) at 133-52 (Testimony of Jack Klein).

Thus, the mailings were incident to an essential part of the scheme, i.e., concealing HCA's true profits. We hold that there was sufficient evidence to sustain Coyle's conviction on the three counts of mail fraud.

### III.

#### False Statements Conviction

Counts Four through Eight charged Coyle with making false statements on documents required by ERISA in violation of 18 U.S.C. § 1027. That section, which can be read and understood more easily with some editorial emphasis and bracketed numerical insertions, reads:

11

> Whoever, <u>in any document</u> required by title I of the [ERISA] to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, [1] <u>makes any false statement</u> or representation of fact, knowing it to be false, <u>or</u> [2] <u>knowingly conceals</u>, covers up, or fails to disclose <u>any fact</u> the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 1027 (emphasis and bracketed numbers added). This court has previously stated that the three elements necessary to sustain a conviction under section 1027 are (1) the defendant made a false statement; (2) knowing it to be false; and (3) in a document required by ERISA. <u>United States v. Furst</u>, 886 F.2d 558, 568 (3d Cir. 1989), <u>cert. denied</u>, 493 U.S. 1062 (1990).

Coyle does not argue that the government failed to prove that he made false statements knowing them to be false. Instead he argues that the district court erred in "refus[ing] to give the instruction proposed by the defense limiting the jury's consideration to only those factual disclosures on the Schedule A forms which were legally compelled." Appellant's Brief at 20. In another, but related contention, Coyle argues that the indictment charged only one of the disjunctive methods of violating 18 U.S.C. § 1027, but that the court instructed the jury about both, and that this led to a fatal variance.

12

Generally, we review the district court's refusal to give certain jury instructions under an abuse of discretion standard although where, as here, the question is whether the jury instructions stated the proper legal standard, our review is plenary. See Government of the Virgin Islands v. Isaac, 50 F.3d 1175, 1180 (3d Cir. 1995). As on all occasions when we consider jury instructions we consider the totality of the instructions and not a particular sentence or paragraph in isolation. In Re Braen, 900 F.2d 621, 626 (3d Cir. 1990), cert. denied, 498 U.S. 1066 (1991).

Each of the five false statement counts alleges that Coyle "in a document required to be published by ERISA . . . and required to be kept as part of an employee welfare benefit plan by ERISA" unlawfully and knowingly caused the making of a false statement and representation of fact, and that those acts violated 18 U.S.C. §§ 1027 and 2 (emphasis added). Each of the false statements counts unambiguously charges that the false information consisted of "the amounts of claims paid, [HCA's payments to the physician and dentist providers]," "administrative service or other fees" and "total retention." Each false statement count unambiguously charges that the false reports with which Coyle is charged appeared in the Schedules A prepared by HCA and filed by or on behalf of the Fund as part of the Forms 5500.

We discern what appear to be several different threads to Coyle's challenge to his false statements conviction, none of which are convincing. We do not understand Coyle to argue that

13

the documents, i.e., the Schedules A, were not documents that were required by ERISA to be published or kept.  He argues instead, in somewhat abbreviated fashion, that HCA does not fall within the statutory sections that impose the obligation to make the factual disclosures that were proven to be false.  However, inasmuch as the false factual statements were in documents required by ERISA to be published or kept, Coyle's argument misses the mark.

29 U.S.C. § 1023 requires an annual report to be published and filed with the Secretary of Labor for every covered employee benefit plan, and that it contain specified information. Subsection (a)(2)(A) requires that if some of the information that the administrator, here the Fund Trustees, needs to submit the annual report and to comply with title I of ERISA is maintained by "an insurance carrier or other organization which provides some or all of the benefits under the plan, or holds assets of the plan in a separate account," that organization must transmit and certify the accuracy of such information to the administrator. (emphasis added).  See also 29 C.F.R. § 2520.103-5(a).  Subsection (e) requires that information as to, inter alia, total claims paid, commissions paid, and administrative fees paid be enumerated on a statement included in the annual report (the Schedule A) "[i]f some or all of the benefits under the plan are purchased from and guaranteed by an insurance company, insurance service, or other similar organization." (emphasis added).

14

Coyle contends that HCA is not an "other similar organization." The district court instructed the jury that as a matter of law HCA was "a medical service provider" and therefore subject to the obligation to transmit and certify information needed by the administrator to file its annual report. In doing so, the court relied on our decision in United States v. Martorano, 767 F.2d 63 (3d Cir.) (per curiam), cert. denied, 474 U.S. 949 (1985). In Martorano, a welfare fund had contracted with AMMA Health Center, Inc. to provide outpatient medical coverage to union members. Id. at 64. The Fund requested that AMMA prepare utilization reports which it needed to complete Form 5500. Martorano, who prepared AMMA's reports, significantly understated its profits on the utilization reports, and was indicted under 18 U.S.C. § 1027 for making false statements in documents required by ERISA.

We rejected Martorano's argument that 18 U.S.C. § 1027 applies only to fiduciaries of union pension and welfare funds and does not apply to medical service providers. We held that by selling medical services to the Fund, AMMA fell under the statutory coverage of 29 U.S.C. § 1023(e) of ERISA. Id. Therefore, the "understatement of profits by a health care organization that furnishes outpatient medical coverage to members of a health and welfare fund governed by ERISA constitutes a violation of [18 U.S.C. § 1027]." Id. at 64; see also United States v. Sarault, 840 F.2d 1479 (9th Cir. 1988) (false statements made by attorney representing an assetless insurance company). We concluded that the language in 18 U.S.C.

15

§ 1027 is broad enough to cover medical service providers and reasoned that such a construction would promote the goals of ERISA because "[i]f medical service providers are not sanctioned for providing false information, plan participants will suffer." Martorano, 767 F.2d at 65.

Although AMMA, unlike HCA, itself provided the medical services, it was HCA that undertook to design, contract for and administer the dental and vision care benefit plans for Local 286's Fund, and it was only HCA that maintained the records and was in the position to supply the Fund with the information to which 29 U.S.C. §§ 1023(e) and 1023(a)(2)(A) refer. Moreover, it was HCA which held the premiums, i.e., the "assets of the plan" as referred to in the statute, in a separate account. See Transcript of Jury Trial, Nov. 30, 1993 (9:30 a.m.) at 140 (Testimony of Jack Klein). Therefore, we agree with the district court that HCA had the reporting and record-retaining obligations that ERISA imposes.

Coyle also seems to argue that the false statements can be excused because they were made in response to questions on Schedules A that apply only if the contracts were "experience-rated," and Coyle contends the Fund's plans were not because they did not set group premiums by evaluating participant utilization of medical services. This is a red herring. Coyle admits that HCA completed the Schedules A on behalf of the Fund for the years in question as though the contracts were "experience-rated," and that the figures for claims paid and administrative costs retained in the responses to those questions were false. Coyle's

16

argument on the "experience-rated" issue seems based on his premise that the crime charged was that of making false statements as to factual "disclosures" which were required, but as discussed above the crime charged and proven was that the false statements appeared on ERISA-required "documents."

Moreover, the Fund specifically requested that HCA prepare the Schedules A. HCA was obliged by the statute to certify the accuracy of its statements. See 29 U.S.C. §1023(a)(2)(A). It also had an obligation under title I of ERISA to maintain records which provide in sufficient detail information from which required documents might be verified and checked for accuracy and completeness. See 29 U.S.C. § 1027. HCA purported to comply with its obligations by reporting to the Fund on the Schedules A it prepared. Even if HCA erred by completing the section for experience-rated contracts, the information it did provide was proven false, thus violating the prohibition of 18 U.S.C. § 1027 against "making any false statement or representation of fact, knowing it to be false" in a document ERISA requires be published or kept.

Coyle offers no authority to support the implicit and rather bold proposition that one may make false statements or supply information to the government on required forms, but avoid liability if the false information voluntarily supplied may have been more than required. Such an argument would undercut one of the purposes of section 1023 of ERISA, which is to enable the Department of Labor to use the annual reports and the Schedules A to carry out its statutory responsibilities, including the

initiation and conduct of investigations to assure the integrity of the individual plans and the $205 trillion estimated to be in ERISA plan assets. We thus reject Coyle's contention that the court should have limited the jury's consideration to required factual "disclosures."

Coyle's other argument, i.e., that the instruction the court did give was erroneous because the indictment charged only one of the two methods of violating 18 U.S.C. § 1027 but the court charged as to both, also stems from Coyle's preoccupation with the "disclosure" language. Admittedly, in this respect the indictment could have been more carefully drawn, but we see no reversible error in the charge.

To understand we return to the statute, and the disjunctive crimes set forth in 18 U.S.C. § 1027. The statute as read by this court, and as read by Coyle, is set forth in the Appendix to this opinion.

The district court's comprehensive charge correctly delineated both crimes. The court explained that the indictment charged Coyle, inter alia, with "false statements and concealment of facts in relation to documents required by [ERISA]." App. at 422-23 (emphasis added). After explaining that the jury must find that the Fund fell within ERISA, the court stated that the Government must prove beyond a reasonable doubt "that [1] the defendant made or caused the making of a false statement or representation of fact knowing it to be false or [2] knowingly concealed, covered up or failed to disclose any fact, the disclosure of which is necessary to verify, explain, clarify or

18

check for accuracy and completeness any form 5500 Schedules A published by the Local 286 Paper Converters Welfare Trust Fund." App. at 423 (bracketed material and emphasis added). The court then told the jury it must find that the Schedules A submitted by Coyle to the Fund were documents required by ERISA, and that Coyle acted knowingly.

Coyle reads the statute to set out the following two methods of violation, i.e., "[t]he first method is by making a false statement of fact (or by covering up or failing to disclose such fact) the disclosure of which fact is required by Title I of ERISA," Appellant's Brief at 19, and the second method is "making a false statement of fact, the disclosure of which is <u>not</u> required by ERISA, but is nonetheless necessary to verify, explain, clarify or check the accuracy or completeness of reports which are required to be filed." <u>Id.</u> at 20. Coyle misreads the statute.

The court correctly told the jury that to establish a violation the government must prove (1) the knowing <u>making of a false statement</u> or representation of fact in an ERISA-required document or (2) <u>the knowing concealment</u>, cover-up, or failure to disclose any fact the disclosure of which is required or is necessary to verify, explain, etc. One violation deals with the making of a false statement, the other with the omitting or concealment of relevant facts. They are separated by an "or" with verbs on either side, i.e., "makes any false statement" <u>or</u> "knowingly conceals . . ." The statute would charge a violation in grammatical terms even if the language describing one or the

19

other prong were completely eliminated. In contrast, Coyle's reading of the statute erroneously divides the violations in an ungrammatical manner. This is evident from the Appendix to this opinion.

Coyle's theory of a variance between the indictment and the charge may stem from the fact that the indictment contained surplus language relating to facts the "disclosure of which is required" by ERISA, added to what we have referred to as the "making false statement" prong of 18 U.S.C. § 1027. That language more appropriately belongs with the "knowing concealment" prong of 18 U.S.C. § 1027, i.e., concealment or nondisclosure of a fact "disclosure of which is required . . . or is necessary to verify," etc. The indictment does not expressly charge that second violation, although it is arguable that the concealment of a necessary fact is but the mirror image of supplying false statements of fact, i.e., not disclosing or concealing the true facts.

Coyle is not entitled to a reversal because of the inclusion of the unnecessary "disclosure of which is required" language which, at most, is mere surplusage. It is a long-standing principle of criminal procedure that "[a] part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as 'a useless averment' that 'may be ignored.'" United States v. Miller, 471 U.S. 130, 136 (1985) (quoting Ford v. United States, 273 U.S. 593, 602 (1927)). Moreover, if the additional language created any confusion, the explanation following the "that is" language

20

of the same sentence made absolutely clear what the charge against Coyle was. Three false statement counts ended with the language, "that is, that defendant caused the filing of a Schedule A with the IRS reporting falsely the amounts of claims paid, administrative service or other fees, and total retention, knowing these amounts to be false." App. at 16. The other two are similar in respects relevant here. These charges were supported by substantial evidence.

Because Coyle contends there was a lack of proof that the factual disclosures were required, he frames an argument of a fatal variance between the indictment and the proof. This is a far cry from the classic fatal variance case on which Coyle relies. In Stirone v. United States, 361 U.S. 212 (1960), the Court held that the trial evidence and the instruction so broadened the possible bases for conviction that they "destroyed the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." Id. at 217.

Here, the concealed facts were the very facts that were the subject of the false statements, i.e., the accurate facts as to payments to doctors and dentists and HCA's administrative costs. Thus, the court's instruction did not prejudice Coyle. See United States v. Pelullo, 964 F.2d 193, 216 (3d Cir. 1992). In order to convict Coyle for the crime charged, under both the indictment and the court's instructions the jury would have had to find that there were false statements made on the Schedules A. The indictment identified the false statements made in the

21

Schedules A with the requisite specificity.  See Fed. R. Crim. P.
7.  There were no other allegedly false documents before the
jury.  Therefore, the variance, if any, did not alter the
elements of the offense charged.  See United States v. Asher, 854
F.2d 1483, 1497 (3d Cir. 1988), cert. denied, 488 U.S. 1029
(1989).  See also Turner v. United States, 396 U.S. 398, 420
(1970) ("[W]hen a jury returns a guilty verdict on an indictment
charging several acts in the conjunctive . . . the verdict stands
if the evidence is sufficient with respect to any one of the acts
charged.").

We reject Coyle's contention that the evidence was
insufficient to sustain a conviction or that the district court
erred in its instruction.

**IV.**

Blackmail Conviction

Coyle contends that the district court erred in its
jury instruction on the blackmail charge.  In so arguing, Coyle
notes correctly that the case law on blackmail is "sparse."
Nonetheless, we find no ambiguity in the statutory language
relevant here.

> The blackmail statute provides:
> Whoever, under a threat of informing, or as a
> consideration for not informing, against any
> violation of any law of the United States,
> demands or receives any money or other
> valuable thing, shall be fined under this
> title or imprisoned not more than one year,
> or both.

18 U.S.C. § 873. The court's instruction closely tracked the statutory language. App. at 429-30.

Two blackmail letters were identified in the indictment and at trial the government produced evidence of a series of five letters written by Coyle to Cusumano beginning October 18, 1990 and continuing until October 29, 1990. They alternate between vague threats, accusations and demands. App. at 81-96.

In one of these letters, Coyle advised Cusumano that he had "been contacted by the FBI to discuss their investigation of the expense accounts you provided them earlier this year," stated, "I really don't wish to be involved and hope to stonewall the request based on unavailability and a lack of a clear memory at this time," and then -- in language that leaves no doubt as to its purpose -- stated, "Any attempt to tamper with my severance, deferred compensation or paid time off adjustment pay or any other moneys due me could reflect in my decision. I know you understand." App. at 87-88.

Coyle engages in semantic sophistry when he argues that because the payment of the benefits was to come from HCA rather than Cusumano, he did not "demand" anything from Cusumano within the meaning of the statute. But the statute does not require that the quid pro quo be a two-party transaction. Coyle's offer "to stonewall" the FBI in exchange for receiving Cusumano's assistance in securing (or forbearance in interfering with) his severance pay from HCA falls within the language of the statute.

Coyle argues that the district court erred in denying his proposed instruction that he could not be convicted if he was

23

entitled to the benefits he demanded. He argues that something to which he was entitled could not be "consideration." However, what is made unlawful by the blackmail statute is Coyle's use of the offer not to report the fraudulent activity or not to cooperate with the authorities as leverage over Cusumano, see United States v. Smith, 228 F. Supp. 345, 348 (E.D. La. 1964), whether or not Coyle had a claim of right to the benefits. The blackmail statute thus reaches those who would evade their responsibility to inform the authorities about a violation of the law by exchanging the promise to forebear from giving such information for some benefit. It is the use of the information in this manner that Congress sought to penalize. A jury could find that this is exactly what Coyle did. The district court did not err in rejecting Coyle's attempt to restrict the scope of the blackmail statute.

**V.**

Calculation of Sentence

Finally, Coyle raises two claims of error in the calculation of his sentence.

Coyle claims that the district court erred in enhancing his offense level by two points for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3. A sentencing court must first determine whether the defendant held a position of trust, a purely legal question for which our review is de novo. United States v. Craddock, 993 F.2d 338, 340 (3d Cir. 1993). The second question, whether defendant abused his position in a way that

24

significantly facilitated the crime, is a question of fact which we review for clear error. Id.

"[O]ne has been placed in a position of trust when, by virtue of the authority conferred by the employer and the lack of controls imposed on that authority, he is able to commit an offense that is not readily discoverable." Id. at 342; see also United States v. Lieberman, 971 F.2d 989, 993 (3d Cir. 1992). In both Craddock and Lieberman this court affirmed the two-level enhancement, finding it significant that the defendants' positions--a Western Union teller and a bank vice president, respectively--provided them with the "freedom to commit a difficult-to-detect wrong." See Lieberman, 971 F.2d at 993 (citation and quotation omitted).

In this case, Coyle's position as Chief Financial Officer of HCA afforded him the authority to conceal HCA's true profits and the evidence fully supports the conclusion that the Fund's reliance on his accounting expertise allowed him to commit a "difficult-to-detect" wrong. Coyle's arguments that the government was obliged to offer proof that he was in some way a fiduciary or that the Trustees were naive are unavailing. The district court's imposition of the two-level enhancement was proper.

Coyle also challenges the calculation of fraud loss. Because Coyle is challenging the district court's legal interpretation of "fraud loss," our review is plenary. United States v. Badaracco, 954 F.2d 928, 936 (3d Cir. 1992).

25

Under the applicable guideline, the base offense level for fraud is six, U.S.S.G. § 2F1.1(a), which must be increased according to the size of the loss attributable to the fraud, U.S.S.G. § 2F1.1(b). The district court set the amount of fraud loss at $298,330, and accordingly enhanced Coyle's offense level by eight. U.S.S.G. § 2F1.1(b)(1)(I). This amount was derived from testimony at trial about the difference between the amount HCA reported to be its administrative retention on the Schedules A and the amount it actually retained. The government contended that this was a reasonable estimate of the fraud loss because there was testimony that if the actual amount of administrative retention had been accurately reported, the Fund would have renegotiated the contract and demanded a refund. See App. at 164 (Testimony of Theodore Seidenberg) and App. at 336-41, 351 (Testimony of Alex Johns).

Coyle recognizes that the government's figure may accurately measure the magnitude of HCA's misrepresentation of its actual costs. He argues that it does not measure any loss suffered by the Fund because the Fund could have at most renegotiated lower premium contracts and that the amount of fraud loss should be reduced by the percentage of the loss which derives from the Pennsylvania dental contract because there was no obligation to refund premiums under that contract.

"As in theft cases, [fraud] loss is the value of the money, property, or services unlawfully taken." U.S.S.G. §2F1.1, comment. (n.7); see also United States v. Mummert, 34 F.3d 201, 204 (3d Cir. 1994). Our precedents establish that "fraud 'loss'

26

is, in the first instance, the amount of money the victim has actually lost" revised upward to the "intended or probable loss if either amount [is] higher and determinable." United States v. Kopp, 951 F.2d 521, 523, 536 (3d Cir. 1991). But that is not the exclusive method of measuring fraud loss. Under the guidelines and our precedent, "the offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss." U.S.S.G. § 2F1.1, comment. (n.8); see also Badaracco, 954 F.2d at 938. Also, "[t]he loss need not be determined with precision [and] [t]he court need only make a reasonable estimate of the loss." U.S.S.G. § 2F1.1, comment. (n.8).

In Badaracco, we recognized that certain breaches of fiduciary duty comparable to embezzlement may justify estimating fraud loss by using the "gross gain" alternative, as expressly authorized in Application Note 8. 954 F.2d at 938. In Badaracco, a bank president used his position to approve financing for real estate developments on the condition that the borrowers distribute subcontracting work to companies in which he or members of his family had a financial interest. The district court calculated the fraud loss by adding together the value of the contracts awarded to defendant's family companies. Defendant appealed, claiming that the court should have calculated the loss based on the net profit earned by the family companies rather than the face value of the contracts. Id. at 936.

In affirming this aspect of the sentence, we referred to our opinion in Kopp, where we declined to accept an automatic equation between loss in fraud cases and in theft cases. In

27

theft cases, "loss" was defined as "amount taken."  In Kopp, we had explained that "embezzlement," which is placed under the theft guideline, involves "not only a taking but also an action akin to a breach of fiduciary duty, which might justify always using the amount taken as 'loss.'"  951 F.2d at 530 n.13.  Thus, we held that under the circumstances in Badaracco, i.e., "the officer of a financial institution [who] uses his or her position for personal benefit, there is a breach of fiduciary duty comparable to that implicated by embezzlement."  954 F.2d at 938. This justified using the defendant's "gross gain" as set forth in Application Note 8.

For similar reasons, we hold that it was appropriate for the district court to adopt "amount taken" or "gross gain" as the measure of fraud loss, i.e., the difference between the amount reported and the amount retained.  Inasmuch as this encompasses "gross gain," we reject Coyle's contention that the amount of fraud loss should be reduced by the amount of administrative retention attributable to the Pennsylvania contract even though there was no explicit requirement that surplus funds be returned in that contract.  The circumstances of this scheme have a strong resemblance to embezzlement, and HCA's position vis-a-vis the Fund had elements strongly comparable to those of Badaracco's relationship to the bank.  Thus, the district court's use of the $298,330 fraud loss figure was in keeping with the applicable guidelines, and the district court's decision to increase Coyle's base offense level by eight was not error.

28

**VI**.

<u>Conclusion</u>

For the foregoing reasons, we will affirm the judgment of conviction and sentence imposed by the district court.

_____

TO THE CLERK:

Please file the foregoing opinion.

_____

Chief Judge

A P P E N D I X

18 U.S.C. § 1027 (with emphasis and bracketed numbers supplied by court):

> Whoever, in any document required by title I of the [ERISA] to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, [1] <u>makes any false statement or representation of fact,</u> knowing it to be false, <u>or</u> [2] <u>knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by</u> such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 1027 (with emphasis and bracketed numbers supplied by Coyle, Appellant's Brief at 19):

> Whoever, in any document required by title I of the [ERISA] to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact [1] the disclosure of which is required by such title <u>or</u> [2] <u>is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published</u> or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.

Honorable Donetta W. Ambrose, United States District Judge for the Western District of Pennsylvania, sitting by designation.