The UNITED STATES of America,

v.

Freda TILLER.

No. CRIM. A. 99–485.

United States District Court, E.D. Pennsylvania.

April 26, 2001.

Joel D. Goldstein, AUSA, U.S. Atty. Office, Philadelphia, PA, for plaintiff.

Arthur Donato, Media, PA, Mary E. Welch, Media, PA, for defendant.

### MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

On August 17, 1999, defendant Freda Tiller ("Tiller") was charged with forty-one counts of federal mail fraud under 18 U.S.C. § 1341. The government withdrew twenty-three counts before submitting the case to a jury. A jury convicted Tiller of the remaining eighteen counts of mail fraud. Now before me are the defendant's post-trial motions. The defendant moves

pursuant to Federal Rule of Criminal Procedure 29(c) for the entry of a judgement of acquittal on all counts. In the alternative, the defendant moves pursuant to Federal Rule of Criminal Procedure 33 for a new trial. On January 16, 2001, I heard oral argument on the motions. During the argument, I ordered the parties to submit supplemental briefs on the issue of whether the mailings were in furtherance of the scheme of fraud.[1] I will now rule on the motions.

## I. Summary of the Facts

Tiller was charged under an indictment stating that, "[f]rom on or about February 21, 1994 to on or about November 6, 1995, defendant FREDA TILLER devised and intended to devise a scheme and artifice to defraud [Philadelphia Housing Authority] and to obtain money and property by means of false and fraudulent pretenses, representations and promises." Indictment at 3, ¶ 10. During the 21 month period covered by the indictment, Tiller was employed as a managed care caseworker at Villanova Rehabilitation Consultants, Inc. (VRC). VRC is a medical managed care consulting firm, offering the service of monitoring the medical care provided under insurance policies, to ensure that the medical care being received is appropriate and necessary.

VRC contracted to provide this service to Philadelphia Housing Authority (PHA), to monitor the medical treatments covered by PHA's workers' compensation insurance policies. The essence of the service being provided by VRC to PHA is in-person, on-site monitoring of the medical care administered by health care providers to PHA employees ("claimants") who are receiving treatment for on-the-job injuries. Individual PHA claimants are assigned to

caseworkers employed by VRC. Caseworkers meet with the claimants at the offices of doctors and therapists and then prepare a detailed written report describing the condition of the claimant, the course and propriety of the medical care being provided, and the prognosis for the claimant's return to work.

VRC bills PHA for its services on a per-visit basis. When a caseworker submits a report, VRC prepares an invoice from the report. The invoice parses the activity for which PHA is being charged, including travel time, time spent with the doctors, therapists, and claimants, and any incidental expenses such as telephone calls. VRC then sends the invoice to Crawford and Company ("Crawford"), the third party administrator for the PHA workers' compensation policy. Crawford mails payment to VRC based on the invoice.

VRC caseworkers are paid, above and beyond their salary, on an incentive basis, $40 for every visit made and reported in excess of six visits per week. In addition to the report for each visit, caseworkers are also required to document their activities on VRC records known as Weekly Activity Summaries and Expense Reports. The Weekly Activity Summaries track the number of visits the caseworker made for each two-week pay period. Caseworkers receive bi-weekly pay checks that include any incentive bonuses.

During the life of the scheme, Tiller, in her position as caseworker at VRC, prepared and submitted reports that falsely stated that she had visited PHA claimants, when in fact she had not. Tiller's reports identified the claimants as PHA employees. In many instances, PHA was named as a carbon-copy recipient of the report. VRC then prepared an invoice based on

1. The government submitted a supplemental brief on this issue on February 16, 2001. The

defendant submitted a supplemental brief in response on February 28, 2001.

each of Tiller's false reports. VRC submitted the invoices to Crawford. Crawford mailed checks for payment to VRC. The indictment charged that the relevant mailings for mail fraud were the "[c]hecks mailed by Crawford, which included fees charged by VRC for visits claimed to have been made by defendant FREDA TILLER, which visits defendant FREDA TILLER had not made." Indictment at 5, ¶ 19. Tiller submitted such false reports over the course of 21 months.

At trial, the government introduced into evidence copies of Tiller's reports, Weekly Activity Summaries, and invoices prepared by VRC. Tiller testified at trial that she is aware that all companies use the mails as part of their business.

## II. Rule 29(c) Motion for Judgement of Acquittal

▆▆▆ Federal Rule of Criminal Procedure Rule 29(c) provides that "if the jury returns a verdict of guilty, the court may on such motion set aside the verdict and enter judgement of acquittal." The only basis for a judgement of acquittal is insufficiency of the evidence at trial to sustain conviction. *See United States v. Clemons,* 658 F.Supp. 1116 (W.D.Pa.1987), *aff'd,* 843 F.2d 741 (3rd Cir.1988), *cert. denied,* 488 U.S. 835, 109 S.Ct. 97, 102 L.Ed.2d 73 (1988). "When the sufficiency of the evidence at trial is challenged," a court must view the evidence "in the light most favorable to the government." *United States v. Coyle,* 63 F.3d 1239, 1243 (3rd Cir.1995) (citing *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942)). A court must affirm the convictions, "if a rational trier of fact could have found defendant guilty beyond a reasonable doubt,

and the verdict is supported by substantial evidence." *Id.*

▆▆▆ The defendant moves pursuant to Federal Rule of Criminal Procedure 29(c) for a judgement of acquittal on the ground that the government failed to establish the mailing element of federal mail fraud as required under 18 U.S.C. § 1341. There are two prongs to the mailing element. The statute provides in relevant part:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting to do so . . . knowingly causes to be delivered by mail . . . any such matter or thing, shall be [guilty of the offense]."

18 U.S.C. § 1341. Based on the statute, the defendant must "cause" the mails to be used "for the purpose of executing" the scheme of fraud. *Id.* Federal mail fraud reaches "only those limited instances in which the use of the mails is part of the execution of the fraud." *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 89 L.Ed. 88 (1944). Causation is satisfied "where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954). Thus, the mailing element is satisfied if: (1) the mailings were part of the execution of the fraud; and (2) either (a) the defendant had knowledge that use of the mails would follow in the ordinary course of business or (b) it was reasonably foreseeable that the mails would be used.[2]

---

**2.** In this case, the government relies on the latter method of proving causation—arguing

that it was reasonably foreseeable that the mails would be used. This is an objective

■ As the defendant correctly states, the government is required to prove the mailing element as set forth in the indictment. *See United States v. Lebovitz,* 669 F.2d 894, 896 (3rd Cir.1982) ("The completion of the scheme must depend in some way on the mailings charged"). *See also, United States v. Smith,* 934 F.2d 270, 273 (11th Cir.1991) ("We do not believe the bare fact that large organizations mail communications between offices brings every fraud against such entities within the federal mail fraud statute"); *United States v. Walters,* 997 F.2d 1219 (7th Cir.1993). The indictment in this case charged that the relevant mailings were the "[c]hecks mailed by Crawford, which included fees charged by VRC for visits claimed to have been made by defendant FREDA TILLER, which visits defendant FREDA TILLER had not made." Indictment at 5, ¶ 19. Thus, the government was required to prove that the mailing of these checks by Crawford to VRC was both part of the execution of the scheme of fraud and reasonably foreseeable. The defendant asserts that the evidence produced at trial is insufficient on both grounds.

The defendant first argues that the mailing element was not satisfied because the evidence was insufficient for the jury to find that the charged mailings were part of the execution of the scheme of fraud. The defendant contends that the scheme of fraud was successfully completed prior to any mailing and that the mailings charged involved merely post-fraud accounting among potential victims of the scheme. *See* Defendant, Freda Tiller's Omnibus Memorandum of Law in Support of Post Trial Motions ("Defendant's Motion"), 2–6. The defendant summarizes the scheme as follows:

"Assuming that defendant did engage in such a scheme, the fraud was against [her employer,] Villanova Rehabilitation Consultants, not Philadelphia Housing Authority and was completed and over at the moment defendant turned in her weekly activity summaries and taped reports. The success of the scheme in no way depended on the mailing by Crawford & Company because the evidence showed that defendant was paid directly by Villanova Rehabilitation Consultants."

*Id.* at 4. Under this characterization, the scheme was completed each time Tiller received her bi-weekly pay check from VRC, which included incentive bonuses for her false reports. The defendant asserts that the facts of this case are similar to the facts in three Supreme Court cases in which the court held that the charged mailings were not part of the execution of the scheme of fraud. *See Kann,* 323 U.S. 88, 65 S.Ct. 148; *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960); *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974).

In *Kann,* the defendants were corporate officers and directors accused of setting up a dummy corporation through which to divert profits into their own pockets. As part of their scheme, the defendants caused the corporation to issue checks payable to them, which they cashed at local banks. The defendants were indicted in three counts based on three separate checks cashed which were drawn on two different local banks. The government argued that the mailing element was satisfied when the local banks mailed the checks to the drawee banks for collection. The court rejected this argument, because the scheme reached fruition prior to the

standard. *See United States v. Bentz,* 21 F.3d 37, 40 (3rd Cir.1994) ("[T]he two methods are distinct. Under *Periera,* the ordinary course of business prong requires knowledge, whereas reasonable foreseeability is an objective test.") (citations omitted).

mailings, when "the persons intended to receive the money had received it irrevocably." 323 U.S. at 94, 65 S.Ct. 148. "It was immaterial to [the defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank." *Id.*

In *Parr*, the defendants were charged with fraudulently obtaining gasoline and other products and services through the unauthorized use of a credit card issued to their employer. The government argued that the mailing element was satisfied when the oil company which issued the credit card mailed invoices to the employer for payment and when the employer mailed payments back to the company. The court held that it was immaterial to the defendants how the oil company went about collecting its payment. The scheme was complete when the defendants fraudulently obtained the gasoline, products, and services. *See* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277.

Finally, in *Maze*, the defendant allegedly stole his roommate's credit card, headed south on an excursion, and obtained food and lodging at motels along the way using the stole credit card. The government argued that the mailing element of the statute was satisfied by the fact that the defendant knew that each motel proprietor would mail an invoice to the bank that had issued the credit card, which in turn would mail a bill to the card owner for payment. The court held that the scheme reached fruition when the defendant checked out of each hotel and that the success of the scheme in no way depended on the mailings. The mailings merely determined which of his victims would ultimately bear the loss. *See* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603.

In the most recent Supreme Court opinion discussing when mailings are part of the execution of the scheme of fraud, the court explained:

"To be part of the execution of the fraud, [ ] the use of the mails need not be an essential element of the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). It is sufficient for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot.' " *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 60 L.Ed. 706 (1916)."

*Schmuck v. United States*, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). The Third Circuit has held "that the mailings must be sufficiently closely related to the scheme to bring the conduct within the ambit of the mail fraud statute." *United States v. Coyle*, 63 F.3d 1239, 1244 (3rd Cir.1995) (citing *Lebovitz*, 669 F.2d at 896). The "scheme's completion [must] depend [ ] in some way on the charged mailings." *Id.* (citations omitted). Under Supreme Court precedent, "the relevant question at all times is whether the mailing is part of the scheme as conceived by the perpetrator at the time." *Schmuck*, 489 U.S. at 715, 109 S.Ct. 1443.

The government argues that this case is "conceptually a virtual replay of the Supreme Court's decision in *Schmuck*," in which the court found that there was sufficient evidence from which a rational jury could have concluded that the mailings were part of the execution of the scheme of fraud. Government's Supplemental Response to Defendant's Post–Trial Motions ("Government's Supplement"), 4; *See Schmuck*, 489 U.S. at 711–12, 109 S.Ct. 1443. In *Schmuck*, the defendant purchased used cars, rolled back their odometers, and then sold the cars to retail dealers at prices artificially inflated because of the low-mileage readings. The car dealers then resold the cars to customers who paid prices reflecting the artificial inflation

caused by the defendant's fraud. To complete the resale of each car to the customer, the dealers mailed a title-application form to the state Department of Transportation. This submission was the relevant mailing charged by the government in the indictment for mail fraud. Receipt of state title was a prerequisite for completion of the resale to the customers. *See Schmuck*, 489 U.S. at 707, 109 S.Ct. 1443. The defendant dealt with several of the retail dealers "on a consistent basis over a period of about 15 years." *Id.* at 711, 109 S.Ct. 1443.

The defendant in *Schmuck* relied on the same three cases relied on by Tiller—*Kann, Parr*, and *Maze*—to argue that the charged mailings occurred after the fraud reached fruition and were "merely tangentially related to the fraud." *Id.* at 711, 109 S.Ct. 1443. The Supreme Court rejected the defendant's argument based on the ongoing nature of the defendant's scheme:

> "Schmuck's was not a 'one-shot' operation in which he sold a single car to an isolated dealer. His was an ongoing fraudulent venture. A rational jury could have concluded that the success of Schmuck's venture depended upon his continued harmonious relations with, and good reputation among, retail dealers, which in turn required the smooth flow of cars from the dealers to their [ ] customers.
>
> Under these circumstances, we believe that a rational jury could have found that the title-registration mailings were part of the execution of the fraudulent scheme, a scheme which did not reach fruition until the retail dealers resold the cars and effected the transfer of title. Schmuck's scheme would have come to an abrupt halt if the dealers either had lost faith in Schmuck or had

not been able to resell the cars obtained from him. These resales and Schmuck's relationship with the retail dealers naturally depended on the successful passage of title among the various parties. Thus, although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme."

*Id.* at 711–12, 109 S.Ct. 1443.

It was on this basis that the court distinguished the facts in *Schmuck* from the facts in *Kann, Parr*, and *Maze*. In *Kann, Parr*, and *Maze*, as in *Schmuck*, the defendant reaped a material benefit from the fraud prior to the relevant mailings. *Kann, Parr*, and *Maze*, however, involved a series of discrete frauds, rather than one on-going scheme of fraud. In *Schmuck*, because the defendant had a long-term relationship with one of the potential victims of his fraud and repeatedly perpetrated the same fraudulent transaction, from which he benefitted over an extended period of time, the court found that the defendant engaged in an "on-going fraudulent venture." *Id.* at 711, 109 S.Ct. 1443. The title-application mailings completed each individual transaction and facilitated the long-term success of the scheme. The mailings in *Kann, Parr*, and *Maze*, the Supreme Court explained in *Schmuck*, "involved little more than post-fraud accounting among potential victims of the various schemes, and the long-term success of the fraud did not turn on which of the potential victims bore the ultimate loss." *Id.* at 714, 109 S.Ct. 1443. In all three cases, the court concluded that the defendants were indifferent to the ultimate distribution of loss effected by the mailings.[3]

---

**3.** In *Schmuck*, the defendant was not indiffer-     ent to which of the potential victims bore the

Here, Tiller characterizes the facts as a series of discrete frauds, arguing that the mailings by Crawford to VRC occurred after the completion of the fraudulent scheme and were immaterial to the success of the scheme. Tiller contends that the facts in this case are similar to the facts in *Kann*, *Parr*, and *Maze* and distinguishable from the facts in *Schmuck*. The evidence does not support the defendant's characterization of the scheme.

■ The facts in this case are materially indistinguishable from the facts in *Schmuck*. Tiller repeatedly perpetrated the same fraudulent transaction against the same victim or victims and profited from her fraud over the long-term course of the scheme. Tiller benefitted from her fraud every two weeks when she received her incentive bonus for visits she never made, just as the defendant in *Schmuck* benefitted each time a dealer purchased a car at an artificially inflated price. Had Tiller's scheme involved submission of a single false report to VRC, it would have been irrelevant to her whether Crawford mailed payment for the report to VRC. The scheme would have been successfully completed upon Tiller's receipt of her incentive bonus from VRC. But, these are not the facts. Tiller repeatedly submitted false reports to VRC with respect to PHA

claimants over the course of twenty-one months.

The nature of Tiller's relationship with the victims of her fraud also indicates that the scheme was an on-going venture rather than a series of discrete frauds. As in *Schmuck*, Tiller sought to perpetrate repeatedly the same fraud against the same potential victims, VRC and PHA. Tiller had a long-term relationship with one of those potential victims, her employer VRC. Maintaining this relationship was essential to her ability to continue to repeat the fraud. Crawford, PHA's third party administrator, mailed payment to VRC on a per-visit basis in accordance with VRC's invoices prepared from each of Tiller's false reports. The payments mailed by Crawford to VRC completed each fraudulent transaction in furtherance of the ongoing fraudulent venture. A rational jury could have concluded that the success of Tiller's fraudulent venture depended upon her continued harmonious relationship with VRC, which in turn required the smooth flow of payment from Crawford to VRC for Tiller's false reports. Just as in *Schmuck*, Tiller's fraud likely would have been discovered by VRC and her scheme of fraud "would have come to an abrupt halt" if VRC had not been able to collect payment from Crawford for Tiller's work. *Schmuck*, 489 U.S. at 712, 109 S.Ct. 1443. As in *Schmuck*, the mailings were part of

---

ultimate loss. The success of Schmuck's scheme depended upon on his ability to maintain his good relationship with the retail dealers. The relevant mailings were necessary to transfer the loss from the dealers to the customers, which were distant third party victims. In other words, the mailings in *Schmuck* were part of the scheme of fraud because the mailings were necessary to shift the loss from the dealers, the victim with whom the defendant had a long-term relationship, to the customers, the distant third party victims.

*Kann* is distinguishable from *Schmuck* because the indictment in *Kann* did not charge

an on-going scheme. It charged three separate counts for three separate checks cashed. In both *Parr* and *Maze*, the mailings were not necessary to transfer the loss from the victim with whom the defendant had a long-term relationship to a distant third party victim. In both cases, the victim that bore the initial loss was a distant third party—i.e. the gas company in *Parr* and the motels in *Maze*. The success of the scheme did not depend upon the defendants' ability to maintain a good relationship with these victims. Therefore, the mailings were not necessary to the success of the scheme.

the scheme of fraud because the mailings were necessary to shift the loss from VRC, the victim with whom Tiller had a long-term relationship, to PHA, the distant third party victim. Therefore, as in *Schmuck*, there is sufficient evidence from which a rational jury could conclude that Tiller was not indifferent to the fact of whether VRC or PHA ultimately bore the loss.

■■■ The defendant argues that there was no evidence presented that Tiller had any knowledge of the billing procedures used at VRC and, therefore, that it was not reasonable to conclude that she in any way contemplated the relevant mailings as part of the execution of the scheme. *See* Supplemental Memorandum of Law in Support of Defendant's Post Trial Motions, 8–9. The evidence presented at trial does not support this argument. Tiller was aware of the nature of VRC's business, as a medical managed care consulting firm. Tiller testified at trial that she understood that most organizations use the mails as part of their business. Based on the reports submitted by Tiller, Tiller was also aware that she was serving exclusively PHA claimants. Furthermore, Tiller knew that she was compensated by VRC on the basis of the number of reports she submitted. Based on this evidence, a rational jury could have concluded that Tiller had knowledge that VRC receives payment from PHA on a per-report basis and, therefore, that by submitting false reports to VRC, she caused payments to be mailed to VRC. The fact that Tiller may have had no knowledge of Crawford's

role as third party administrator for PHA is immaterial. There was sufficient evidence presented from which a rational jury could conclude that the mailing of payment to VRC was part of the execution of the scheme as conceived by Tiller.[4]

■■■ There was also sufficient evidence from which a rational jury could conclude that the relevant mailings were reasonably foreseeable. The same facts in evidence that support a finding that the mailings were in furtherance of the scheme of fraud as contemplated by the defendant, also support this second prong of the mailing element. Tiller was aware of the nature of VRC's business, as a medical managed care consulting firm. Tiller testified at trial that she understood that most organizations use the mails as part of their business. Based on the reports submitted by Tiller, Tiller was also aware that she was serving exclusively PHA claimants. Furthermore, Tiller knew that she was compensated by VRC on the basis of the number of reports she submitted. A rational jury could have concluded from these facts that the Crawford mailings were reasonably foreseeable. Defendant's motion for judgement of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) will be denied.

### III. Motion for New Trial Pursuant to Federal Rule of Criminal Procedure 33

■■■ Federal Rule of Criminal Procedure 33 provides that a court may grant a new trial "if required in the interest of

---

4. The defendant further argues that the government presented no evidence that Crawford would have cut off payment to VRC if it discovered that the in-voices were based on false reports and that VRC would have subsequently fired Tiller. Given that there was sufficient evidence from which a rational jury could conclude that Tiller contemplated the

charged mailings as part of the execution of her scheme of fraud, the government was not required to prove that, in fact, the scheme would have come to an abrupt halt had the payments ceased. Such evidence would have merely provided additional support for a finding that the mailings were part of the execution of the scheme of fraud.

justice." The defendant moves pursuant to Federal Rule of Criminal Procedure 33 for a new trial on two grounds. First, the defendant contends that I erred in instructing the jury as to the mailing requirement of 18 U.S.C. § 1341. The portion of the instruction that defined the government's burden as to the mailing element was as follows:

"The third element of mail fraud requires that the Government prove beyond a reasonable doubt that the United States mails were used in furtherance of the scheme to defraud.

Under the law, when a defendant does an act with knowledge that the use of the mails will follow in the ordinary course of events, or where such use of the mails can reasonably be foreseen, even though not actually intended, then he or she causes the mails to be used. Therefore, if you are satisfied beyond a reasonable doubt that the defendant engaged in the scheme to defraud as charged in the indictment, and that the use of the mails was a reasonably foreseeable consequence of this scheme and that the individual mailings charged in the indictment contributed to the carrying out of the scheme, the mailing element of the offense is satisfied and you may find the defendant guilty of mail fraud."

The defendant contends that this instruction was in error because "the jury was not instructed that the defendant had to have specific knowledge that the checks from Crawford & Company to Villanova Rehabilitation Consultants would be placed in the mail pursuant to the normal course of business." Defendant's Motion at 12. Specifically, the defendant submits that the last paragraph of the above charge should have read as follows:

"Therefore, if you are satisfied, beyond a reasonable doubt, that the defendant en-

gaged in the scheme to defraud as charged in the indictment, and that the use of the mails was a reasonably foreseeable consequence of this scheme *or that the mail followed in the normal course of business of which the defendant had knowledge,* and that the individual mailings charged in the indictment contributed to the carrying out of that scheme, the mailing element of the offense is satisfied and you may find the defendant guilty of mail fraud."

Defendant's Motion at 11. The defendant further argues that the charge should have instructed the jury "as to the factors they should consider in determining whether or [not] the specific mailings as charged in the indictment were reasonably foreseeable to the defendant." *Id.* at 14.

▮▮▮ When jury instructions are challenged, "we consider the totality of the instructions and not a particular sentence or paragraph in isolation." *United States v. Coyle,* 63 F.3d 1239, 1245 (3rd Cir.1995). The issue is "whether, viewed in light of the evidence, the charge as a whole fairly and adequately submits the issues in the case to the jury." *United States v. Zehrbach,* 47 F.3d 1252, 1264 (3rd Cir.1995), *cert. denied,* 514 U.S. 1067, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995) (citations omitted). In light of my previous analysis of the law as to the mailing element and the evidence presented in this case, there is no basis for concluding that the charge given was in error.

Finally, the defendant argues that I erred in permitting the government to argue to the jury in closing that the mailings by Crawford to VRC were reasonably foreseeable because all companies use the mail. With respect to the mailing element, the government made the following argument in closing:

"The standard for the element of the use of the mails is satisfied if the defen-

dant engaged in a scheme as charged in the indictment and that the use of the mails was a reasonably foreseeable consequence of the scheme. I suggest to you, ladies and gentlemen, on this evidence that that element is easily satisfied.

The defendant went to work for a company that is involved in the cost containment in the field of medicine. They're obviously in business, they do correspondence, it is certainly, ladies and gentlemen, reasonably foreseeable that the mails will be used.

In this case the mails are used because the defendant makes her fraudulent false statement in her report which becomes an invoice, which goes to Crawford who is the agent for the insurance company for PHA who reviews the report."

N.T. 7/13/00, page 6.

■ The defendant did not make a contemporaneous objection to the government's closing argument. In the absence of "plain error", failure to object at trial constitutes a waiver of the issue for post-trial purposes. *See United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (discussing the plain-error exception to the contemporaneous objection rule). *See also, Zehrbach*, 47 F.3d at 1260 n. 6 ("Where a party has not made a clear, specific objection to the charge that he alleges is erroneous at trial, he waives the issue on appeal 'unless the error was so fundamental and highly prejudicial as to constitute plain error' ") (citations omitted).

Even if the defendant had made a contemporaneous objection to the government's closing argument, there would be no basis for a new trial because the government did not misstate the law. The law is that causation is satisfied "where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *Pereira v. United States*, 347 U.S. 1, 9, 74 S.Ct. 358, 98 L.Ed. 435 (1954). The government may not have argued the facts in evidence most probative of this issue. But, the government's statement of the law comports with the legal standard. The defendant had an opportunity in closing to argue against the government's factual statements to the jury. Furthermore, my charge properly instructed the jury as to the government's burden of proof with respect to the mailing element. Therefore, the government's closing argument provides no basis for granting a new trial. Defendant's motion for a new trial will be denied.

An appropriate order follows.

### ORDER

**AND NOW,** this day of April, 2001, it is **ORDERED** that Defendant's Post–Trial Motions for a Judgement of Acquittal and for a New Trial (docket entry # 62) are **DENIED.**