

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-11-1999

# USA v. Universal Rehab

Precedential or Non-Precedential:

Docket 97-1412

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA v. Universal Rehab" (1999). *1999 Decisions.* Paper 38.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/38

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 11, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1412

UNITED STATES OF AMERICA,
        Appellant

v.

UNIVERSAL REHABILITATION SERVICES
(PA), INC.,

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal Action No. 94-cr-00147-1
District Judge: Hon. Robert F. Kelly

Nos. 97-1413 & 97-1467

UNITED STATES OF AMERICA

v.

ATTILA HORVATH,
        Appellant/Cross-Appellee

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal Action No. 94-cr-00147-2
District Judge: Hon. Robert F. Kelly

Nos. 97-1414 & 97-1468

UNITED STATES OF AMERICA

v.

RICHARD J. LUKESH,
        Appellant/Cross-Appellee

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal Action No. 94-cr-00147-3
District Judge: Hon. Robert F. Kelly

Argued: May 22, 1998

Before: ROTH, MCKEE, and GARTH, Circuit Judges

(Opinion filed February 11, 1999)

        Michael R. Stiles
        United States Attorney
        Walter S. Batty, Jr.
        Assistant United States Attorney
        Chief of Appeals

        Valli F. Baldassano (Argued)
        Suzanne B. Ercole (Argued)
        Assistant United States Attorneys
        Suite 1250
        615 Chestnut Street
        Philadelphia, PA 19106

         Attorneys for Appellee/
         and Cross-Appellant

2

        Thomas Colas Carroll, Esquire
          (Argued)
        Carroll & Cedrone
        The Curtis Center, Suite 750
        Independence Square West
        Philadelphia, PA 19106

          Attorney for Appellants/
          and Cross-Appellees

OPINION OF THE COURT

ROTH, Circuit Judge:

Defendants, Universal Rehabilitation Services, Inc. (Universal), Attila Horvath, and Richard Lukesh, were charged with mail fraud and false claims in a 39 count indictment. The government alleged that they conducted a Medicare fraud scheme over a three-year period. The jury convicted the defendants only on a mail fraud count, Count One, the earliest count of the indictment. The government now argues that evidence of illegal activity, which occurred after the date of the offense in Count One but still within the three-year period of the originally charged scheme, can be used to sustain the verdict of guilty on Count One.

In this appeal, we must determine to what extent post-offense evidence can be considered to support the conviction on Count One. We must also decide whether the District Court properly admitted into evidence the guilty pleas of two testifying mid-level managers after defendants had represented to the court that they would not, on cross examination, challenge the credibility of these witnesses or otherwise make the pleas admissible.

I. Facts

The corporate defendant, Universal, provided rehabilitative services, including speech therapy, to Medicare patients in nursing homes. The patients served were primarily the elderly. Universal submitted claims for the patients it treated to Independence Blue Cross (IBC), which administered Medicare coverage. IBC would then submit claims to Medicare.

Medicare is authorized to reimburse speech therapy treatments that are both medically reasonable and necessary. Pursuant to 42 U.S.C. S 1395 et seq. and its implementing regulations, manuals are published that provide Medicare coverage guidelines. These include four criteria to determine if the treatment is medically reasonable and necessary, and therefore reimbursable: 1) the therapy must be safe and effective for treatment of the patient's condition; 2) the services provided to the patient must be of a level of complexity that the services can only be provided by a certified speech pathologist; 3) where restorative treatment is ordered, there must be an expectation that the services being provided to the patient will bring about significant improvement in a reasonable period of time; and 4) the frequency and duration of services must be reasonable and necessary for the patient's condition.

Universal therapists would evaluate patients in accord with the physician's orders and prepare a plan of treatment. The evaluation and plan of treatment must state whether the treatment is in fact necessary. The evaluation and plan is then approved (signed) by the doctor. As treatment progresses, speech therapists create progress notes. If treatment is to continue, Medicare requires that the need for it be certified every 30 days by a medical doctor. Medicare will continue to pay for speech therapy as long as patients are making progress toward the goals established in the plan of treatment. The doctor executes the 30 day certification by signing a Medical Information Form (MIF), which contains a summary, primarily from the therapists' progress notes, of the previous 30 days of treatment, as well as a recommended course of treatment for next 30 days.

Universal submitted electronic Medicare bills to IBC. Essentially, IBC would review Universal's reimbursement claims. Universal and IBC often disagreed about the interpretation of Medicare guidelines and the propriety of the bills submitted. At some point, IBC began requesting that Universal supply the following documentation to support the electronic bills: a) the evaluation and plan of treatment, b) the progress notes, and c) the MIFs.

4

Claims that were rejected would be "rewritten" by Universal staff. Depending on the reason for rejection, the "rewriting" to obtain reimbursement might be fraudulent. For example, if information was missing from a form, Universal personnel would "rewrite" the form to include the missing information. Other "rewriting," however, was not as innocuous. For example, a mid-level corporate employee pled guilty to mail fraud for falsifying the performance record of a patient on certain speech therapy tests to create the "appearance" that the patient had made progress, thereby rendering the services reimbursable. In fact, the patient was not making progress and the services should not have been reimbursable. Another type of "rewriting" consisted of changing evaluations and MIFs after the doctor had signed them. The doctor's signature would then be taped and xeroxed onto the "rewritten" forms.

The government alleged that a mail fraud scheme occurred from the summer of 1988 through September 21, 1991, during which 1) evaluations and plans of treatment were rewritten to create the "appearance" of patients who could properly receive reimbursable therapy; 2) MIFs containing physician's certifications were falsified, that is, altered after the doctor originally signed them and the signature photocopied back on; and 3) progress notes were altered to conform with the falsified evaluation and MIFs. A grand jury indicted Attila Horvath, Vice President and Director of Finance at Universal; Richard Lukesh, Director of Operations at Universal; Universal, the corporation itself; and three other Universal employees for mail fraud, in violation of 18 U.S.C. S 1341 (Counts One through Seventeen, charging 17 mailings in furtherance of the fraud), and false claims, in violation of 18 U.S.C.S 287 (Counts Eighteen through Thirty-nine).

After a jury trial, Horvath, Lukesh and Universal were convicted on Count One and acquitted on each of the other 38 counts, representing 16 other mailings and false claims that arose from the practice of falsifying speech therapy documents. Count One charged that, in furtherance of the scheme, Blue Cross mailed a check, dated May 10, 1989, to Universal. The check represented a claim for treatment

5

rendered to a patient, Mildred Hynds, from February 15 to 28, 1989.[1]

Before trial, defendants had moved in limine to prevent the government from presenting evidence that government witnesses Judy Blum Bonjo and Penny Martin, employees of Universal, had pled guilty to mail fraud.[2] Defendants promised that they would not challenge these witnesses' credibility on cross-examination. Defendants argued that the guilty pleas were not relevant under Rule 401 of the Federal Rules of Evidence and, if relevant, were more prejudicial than probative under Rule 403. The District Court denied the motion in limine. Defendants appeal this evidentiary ruling.

After the verdict, defendants moved for a Fed. R. Crim. P. Rule 29 judgment of acquittal, arguing that there was insufficient evidence to support the jury's verdict. The court denied the motion. Defendants appeal this ruling as well.[3]

The District Court had subject matter jurisdiction over federal indictments, charging violations of the federal criminal code. We have appellate jurisdiction over defendants' direct appeal from a judgment of conviction. 28 U.S.C. S 1291.

II. Sufficiency of the Evidence

Immediately after the jury returned its verdict of conviction on Count One, defendants moved for acquittal under Rule 29, arguing that there was insufficient evidence

_____

1. Counts Two, Three, and Four also involved the mailing of checks that pertained to Mildred Hynds. Count Twenty-seven charged a false claim arising out of a bill that was submitted for the treatment of Hynds.

2. Blum Bonjo testified that she had pled guilty to Count One of the indictment before the jury. App. 2190. Martin was charged in a separate indictment and testified that she had pled guilty to one count of mail fraud.

3. The government also filed a cross-appeal, claiming that the District Court erred at sentencing in refusing to consider the fraud loss from the "virtually identical" conduct charged in the other 38 acquitted counts as relevant conduct under Section 1B1.3 of the Sentencing Guidelines. Because of our holding on defendants' appeal, we do not reach the government's cross-appeal.

to sustain the verdict. The District Court denied the motion as to all three defendants. United States v. Universal Rehabilitation Services, Inc., Attila Horvath, and Richard Lukesh, No. 94-147, E.D.Pa., slip op. 3-12, May 31, 1996. We review de novo the district court's denial of a post-verdict judgment of acquittal. United States v. Iafelice, 978 F.2d 92 (3d. Cir. 1992).

We apply the same legal standard as the District Court. We must view the evidence in the light most favorable to the jury verdict and presume that the jury properly evaluated the credibility of the witnesses, found the facts, and drew rational inferences. Id. at 94. In that light, we "must affirm the convictions if a rational trier of fact could have found defendant[s] guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence." U.S. v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995).

"The mail fraud statute, 18 U.S.C. S 1341, proscribes any scheme or artifice to defraud in which the defendant participated with the specific intent to defraud and in which the mails were used `in furtherance of the fraudulent scheme.' " Coyle, 63 F.3d at 1243."Proof of specific intent . . . may be found from a material misstatement of fact made with reckless disregard for the truth." United States v. Hannigan, 27 F.3d 890, 892 n.1 (3d Cir. 1994). As such, the government must prove that a scheme to defraud existed, that each defendant participated in that scheme, and that each participated with specific intent to defraud. United States v. Pflaumer, 774 F.2d 1224, 1233 (3d Cir. 1985).

It follows from the above that an individual must join a scheme while the scheme exists; that is, that the scheme and a defendant's knowing participation in it must occur over the same period of time. In this case, the government alleged in the thirty-nine count indictment that a scheme took place from the summer of 1988 through September 21, 1991. However, the jury convicted the defendants only on Count One, the May 10, 1989, mailing. The jury acquitted the defendants on the remaining 38 counts, relating to mailings and false claims after May 10, 1989. Thus, we must define the period of time which constitutes the scheme for which the jury convicted the defendants.

Because of the acquittals on Counts Two through Thirty-nine, the scheme could not have run through the entire period which the government charged in the indictment. Nevertheless, May 10, 1989, the date of the offense charged in Count One, is not necessarily the evidentiary cut-off. We must determine whether events that took place after May 10, 1989, up until September 1991, can be used to support the jury verdict on the May 10 mailing.

The government argues that the scheme is not bound in time by the May 10, 1989, mailing -- that the Hynds check, the subject of Count One, was a mailing in furtherance of a broad three year scheme. However, as we made clear in United States v. Pflaumer, 774 F.2d 1224 (3d Cir. 1985), in the context of a conspiracy to commit mail fraud in violation of 18 U.S.C. S 371, the conspiracy at issue "was a conspiracy to violate the mail fraud statute, which end[s] with the last mailing." Id. at 1232. As such, willful membership in the scheme must have existed on or before May 10, 1989, the date of the mailing for the count of conviction. There is no concept of retroactive joinder in mail fraud schemes after the last culpable mailing. Moreover, because the defendants were acquitted of the later-occurring mail fraud counts, those mailings cannot be considered to be "culpable mailings."

Furthermore, the fact that Pflaumer concerned conspiracy to commit mail fraud, not just mail fraud, is a distinction without a difference under the circumstances of this case. A conspiracy to violate a substantive prohibition in a federal statute ends when the unlawful object of the conspiracy has been accomplished. Grunewald v. United States, 353 U.S. 391, 406-15 (1957). In Pflaumer, the object of the conspiracy was the use of the mails to effectuate a scheme to defraud states of tax revenues. Although the scheme to defraud the states may have continued past the last mailing, the use of the mails to effectuate the scheme ceased upon the last mailing. 774 F.2d at 1232.

As was the situation in Pflaumer, the object of the scheme here was mail fraud, the mailing was in furtherance of the scheme, and the mailing marks the end of the scheme. To be sure, subsequent words and deeds may bear on whether a person was participating and

8

participating willfully in a scheme. For example, a statement by a defendant after the end of the scheme may make clear that he was in fact willfully participating in, or had knowledge of, the scheme before it ended. There must, however, be substantial evidence of participation before the mailing. United States v. Pearlstein, 576 F.2d 531, 537 (3d Cir. 1978).

A. Evidence That a Crime Was Committed

The question then is whether there is sufficient evidence of events prior to the May 10, 1989, mailing to sustain the jury verdict? To sustain the jury verdict, in addition to demonstrating that each defendant willfully joined the mail fraud scheme, the government must produce sufficient evidence that a mail fraud scheme existed. This means that there must be sufficient evidence that the Hynds mailing was in furtherance of a mail fraud scheme, i.e. , that the services to Mildred Hynds for which defendants billed and were paid $1,411 by IBC's check # 0249905, dated May 10, 1989, were unauthorized under Medicare coverage guidelines and that defendants' misrepresentation of these services was part of the scheme to defraud.

Defendants argue that there was no evidence that a crime was in fact committed. They argue that the evidence indicates that the treatment rendered to Hynds was authorized by her physician as medically necessary and appropriate. The record reveals a different story. Carol Pomilio, a speech therapist at Universal, testified that Medicare initially rejected the Hynds billing. In order to obtain reimbursement, the February 15, 1989, evaluation and plan of treatment, which the doctor had signed, was destroyed and replaced by one with an altered evaluation that did not accurately reflect Hynds' treatment plan. The doctor's signature was then xeroxed onto the altered document. As documentary support for this treatment plan, Pomilio lowered the scoring percentages on the progress notes. The fact that the treatment was originally ordered by a doctor does not neutralize the fraud; i.e., that the billing for the continued treatment, based on falsified progress notes and a xeroxed doctor's signature, was fraudulent.

There is no doubt that, as defendants argue, the rewriting of or resubmission of rewritten documents is not

9

per se fraudulent. In fact, Julia Blum Bonjo, another Universal speech therapist, testified that a large part of her job consisted of legitimate rewriting or redrafting of documents. However, when the rewriting consisted of misrepresentation of a patient's test results with the intent of obtaining otherwise unauthorized reimbursement, there is sufficient evidence to find an underlying scheme to defraud, which is required as an element of the offense of mail fraud.

The next question we must consider is whether there is sufficient evidence that each of the defendants willfully joined the scheme to commit mail fraud. United States v. Pearlstein, 576 F.2d at 537. In this connection, the government must prove that each defendant willfully joined the scheme before May 10, 1989, the date of the last mailing in furtherance of the scheme. It must show that each defendant possessed the requisite intent to defraud. Proof is required that "defendants must either have devised the fraudulent scheme themselves, or have wilfully participated in it with knowledge of its fraudulent intent." Id. A defendant need not personally be involved with the actual mailing to be liable so long as there was knowledge that the use of mails would follow in the ordinary course of business or that such use can reasonably be foreseen. United States v. Sturm, 671 F.2d 749, 751 (3d Cir. 1982); United States v. Funt, 896 F.2d 1288, 1294 (11th Cir. 1990).4

B. Evidence Linking Defendant Horvath to the Crime

We will first examine the evidence against defendant Attila Horvath up to and through the May 10, 1989, mailing of the count of conviction. The government must prove that Horvath willfully joined the scheme before that date. The District Court enumerated specific record references to Horvath's knowledge and willful participation in the scheme upon which the jury could have relied. However, once we

_____

4. Defendants also contend in their appeals that there was insufficient evidence of the use of the mails. We have reviewed the evidence of the business practices and of specific reference to the correspondence in question, and we will affirm the District Court on this point. See United States v. Burks, 867 F.2d 795 (3d Cir. 1989); United States v. Hannigan, 27 F.3d 890 (3d Cir. 1994).

10

eliminate the post–May 1989 evidence, there is little of any significance.

(1) There is the testimony of Wendy Gold, who was Director of Speech Therapy before Penny Martin. Gold testified that on April 28, 1989, she discussed with Horvath and Lukesh the problem of over-utilization, i.e., treating patients unnecessarily to increase production. Moreover, Gold discussed with Horvath the fact that many of the patients in the nursing homes with which Universal contracted would not qualify for Medicare therapy. At this meeting and in subsequent memos, dated May 8 and May 15, 1989, there was extensive discussion about ways to increase productivity. There was, however, no evidence that anyone suggested falsification in billing. Gold took the position that asking therapists to do what Universal wanted done in order to increase production would not be ethical. Gold subsequently quit due to pressure to increase production.

(2) Judy Blum Bonjo, Director of Utilization Review, testified that her department was directed by Horvath in an April 15, 1991, memo to bill the "risk patients" in order to reduce documentation backlogs. This evidence is not relevant, however, because it refers to an event more than 2 years after the Count One mailing. Additionally, Horvath argues that the memo refers to billing prior to receipt of all the paperwork, not to falsifying information.

Blum Bonjo also testified that Horvath directed her to bill without physician signatures and without some requisite documentation in place. This evidence is problematic because there is no reference to its date. Horvath asserts, and the Government does not controvert, that this reference is to the same April 15, 1991, memo and for that reason occurred after the Count One mailing.

(3) Penny Martin, Director of Speech Therapy after Gold, testified that Horvath wanted patient documentation billable no matter what had to be done. Martin explained that Horvath ran weekly meetings and closely monitored the results of speech therapy practices at Universal. Furthermore, Martin explained that between 1989 and 1991 Blum Bonjo met with Lukesh on a daily basis and

11

with Horvath and Lukesh on a weekly basis. Once again, Horvath asserts, and the Government does not controvert, that Martin's testimony refers to her observations of what Horvath told her in June 1990, one year after the Count One mailing. In fact, Martin did not join Universal until August 1989, several months after the Count One mailing.

Examined as a whole, the record is extremely sparse as to Horvath's willful participation in the scheme before May 10, 1989. The only evidence that clearly concerns pre-mailing events is the Gold testimony. This testimony, however, only establishes pressure to bill, not pressure to bill falsely. Although we hesitate to overturn a jury verdict, we conclude in this instance that, after we exclude the post-mailing evidence, upon which the jury likely relied, there is little to support the jury's verdict. As such, we hold that the District Court erred in denying Horvath's motion for judgment of acquittal. We will remand the case to the District Court to enter a judgment of acquittal for Horvath.

C. Evidence Linking Defendant Lukesh to Crime

Contrary to Horvath, the relevant evidence against Lukesh is stronger.

1) Lukesh admitted he was aware that documents were being rewritten in order to "augment" the billing record. A memo, dated Oct. 28, 1988, directed therapists "to be creative" in getting Medicare reimbursements. On cross-examination, Lukesh testified that one such "creative way" to get reimbursed was to rewrite the document to change the patient profile. Defendants point out that no witness ever testified to interpreting the term "creative" to imply falsification. Nevertheless, the jury could infer Lukesh's state of mind from his choice of words.

2) Lukesh authored a document in the spring of 1988 known as the "billing hold" which became an administrative measure at Universal. This directive was designed to gather information on what billing documents were being held up and for what reason. It was provided to the speech therapists, often with specific directions on how to alter speech therapy documents. While it is possible that Lukesh did not intend that the rewriting of documents, pursuant to this directive, would be fraudulent (Lukesh testified that he

12

believed documents were merely being corrected or augmented), the jury was certainly entitled to infer that Lukesh had knowledge of the fraudulent billing practices.

3) Lukesh was present at an April, 1989, meeting where Blue Cross alerted Universal that documents "were being improperly altered and inappropriate patients were being treated." Lukesh's contention as to the billing hold directive described above, that he believed documents were merely being corrected or augmented, is belied by this meeting with Blue Cross. The information gathered by Lukesh at the meeting, together with his authoring of the directive, lead to the permissible inference that Lukesh knew, well before the Count One mailing, that his employees were falsifying documents.

4) Karen Lightman Pallies, a speech therapist from January 1989 through September 1989, testified that she was required to falsify her therapy documentation and that Lukesh told the therapists at a pre-May 1989 meeting that reports were being rejected by Blue Cross and the therapists would have to keep rewriting these reports until they were accepted. Pallies did admit that re-writing could involve simply "documenting accurate historical facts" as distinguished from "making something up."

5) Blum Bonjo and Martin testified that Lukesh was aware that documents were being altered before being submitted to Blue Cross for payment. The testimony by Martin is problematic because she started working after the Count One mailing. Furthermore, Lukesh asserts, and the government does not controvert, that Blum Bonjo's testimony refers to events around April 1990, after the mailing.

6) Therapist Audrey Isaak told the jury that she attended regular staff meetings between 1988 and 1991 and at one, Lukesh told the staff that "our documentation need[s] to be written in such a way that payment would be granted."

Clearly, the evidence against Lukesh is more substantial than that against Horvath. Certainly Lukesh's authoring of documents designed to effectuate a policy of resubmitting bills and rewriting the documents underlying them, a policy that led therapists to submit fraudulent documents,

13

provides evidence of intent on Lukesh's part. When this evidence is coupled with the fact that Lukesh was informed by Blue Cross of the fraudulent practices, there was sufficient evidence that Lukesh willfully joined the scheme to commit mail fraud.

## D. Evidence Linking the Corporation to the Crime

Universal, the corporate defendant, argues as the basis for its post-verdict judgment of acquittal motion that there was not substantial evidence that it directed its employees to falsify claims. "A corporation is criminally responsible for the unlawful acts of its employees or other agents, provided such unlawful acts are done on behalf of the corporation and within the scope of the agent's employment or apparent authority." United States v. American Radiator & Standard Sanitary Corp., 433 F.2d 174, 205 (3d Cir. 1970).

Universal argues that there was never a corporate policy of falsifying claims and that no individual was directed to falsify claims on behalf of the company. Universal contends that the individual defendants were acting on their own. This argument has no merit. As the District Court explained, without even considering the guilt of the high-level officials Horvath and Lukesh, the evidence was sufficient for the jury to have concluded that Carol Pomilio was acting within the scope of her authority and in the course of her employment with the intent to benefit Universal when she knowingly misled Medicare by altering Hynds' patient documentation. Additionally, numerous witnesses testified that they were pressured to bill for treatment to inappropriate patients and to rewrite patient documentation in order to make claims reimbursable, i.e., to benefit the corporation. For these reasons, wefind sufficient evidence to support the conviction of defendant Universal.

## III. Admissibility of the Guilty Plea of a Testifying Co-Defendant

Julia Blum Bonjo, a speech therapist at Universal, pled guilty to Count One, the mail fraud count on which the other defendants were later convicted. Penny Martin also pled guilty in a separate information to one count of mail fraud. In exchange for the pleas, Blum Bonjo and Martin

14

agreed to testify as government witnesses. Before the trial, defendants moved to bar testimony of the pleas. In their motion, defendants argued that the plea agreements were irrelevant, and, even if they were relevant, they were more prejudicial than probative. Defendants represented that they would not examine Blum Bonjo or Martin in any way that would make this evidence admissible, i.e., they would not challenge their credibility. Moreover, defense counsel asserted that, even if the government was skeptical about his representation that he would not challenge the credibility of Blum Bonjo or Martin on cross examination, the proper procedure was for the court to then permit the government to prove the pleas on redirect.

The District Court denied defendants' motion. Relying on United States v. Gaev, 24 F.3d 473 (3d Cir. 1994), the court explained that, although a guilty plea cannot be used to establish a co-conspirator's guilt, it can be introduced for some valid purpose. After enumerating the proper purposes for which the pleas could be admitted, the trial judge found that the probative value of the evidence outweighed its prejudicial effect and admitted it, denying defendants' motion. The defendants assert that this ruling was erroneous and that the error was not harmless, arguing that "there is a high probability that the jury's conviction on Count One -- in light of its acquittal verdicts on close to 40 other counts -- was influenced by the Bonjo plea to Count One."5

The decision to admit or exclude the evidence is committed to the sound discretion of the district court. In re Merritt Logan Inc., 901 F.2d 349, 359 (3d Cir. 1990). We use an abuse of discretion standard to review the District Court's decision not to exclude evidence under Rule 403. United States v. Gaev, 24 F.3d 473, 476 (3d Cir. 1994).

We note at the outset the well-settled proposition that plea agreements of co-conspirators cannot be used as evidence of a defendant's guilt. Gaev, 24 F.3d at 476. We stated in United States v. Gambino, 926 F.2d 1355 (3d Cir. 1991) that:

_____

5. In her testimony, Blum Bonjo stated that she had pled guilty to "Count One."

15

> [t]here are strong considerations against using a co-conspirator's guilt as substantive evidence of another defendant's guilt. "The foundation of [this] policy is the right of every defendant to stand or fall with the proof of the charge made against him, not against somebody else . . . . The defendant ha[s] a right to have his guilt or innocence determined by the evidence presented against him, not by what has happened with regard to a criminal prosecution against someone else.

926 F.2d at 1363 (quoting in part Bisaccia v. Attorney General of New Jersey, 623 F.2d 307, 312 (3d Cir. 1980)).

However, we have recognized certain valid purposes for which co-conspirators' guilty pleas can be admitted. See, e.g., Gaev, 24 F.3d 476-77 (enumerating proper purposes). The District Court here explained that a plea was admissible for a number of valid purposes. First, the court explained that a plea was admissible to assist the jury in assessing the credibility of the testifying witness. As we explained in Gambino, "by eliciting the witness' guilty plea on direct examination, the government dampens attacks on credibility, and forecloses any suggestion that it was concealing evidence." 926 F.2d at 1363. But, defendants in their pre-trial motion pledged not to challenge Blum Bonjo's and Martin's credibility based on their plea agreements. Thus, there was no reason to allow the government this pre-emptive strike on direct examination. See United States v. Thomas, 998 F.2d 1202, 1205 (3d Cir. 1993).

The District Court also justified its ruling on the motion in limine after the trial by referring to defendants' cross-examination of Blum Bonjo. The court explained that defendants challenged critical aspects of Blum Bonjo's participation in the activities that formed the basis for the mail fraud charge. One cannot, however, use defense counsel's behavior after denial of the motion as any indication of what he would have done had his motion been granted by the court.

The District Court also explained that the pleas were admissible to make clear that defendants were not being singled out for selective prosecution. Indeed in United States v. Inadi, 790 F.2d 383 (3d Cir.), rev'd on other

16

grounds, 106 S.Ct. 1121 (1986), we allowed the admission of a co-conspirator's guilty plea "in order to rebut defense counsel's persistent attempts on cross-examination to raise an inference that the co-conspirators had not been prosecuted, and that [the defendant] had been singled out for prosecution." Id. at 384, n.2. But that is not the case here. Defense counsel in his motion in limine pledged not to engage in questioning on cross examination that would render the pleas admissible. Certainly, if the defense had raised an inference of selective prosecution, this tactic would have been covered by counsel's pledge. However, selective prosecution never became an issue in this case. In Thomas, where selective prosecution was also not an issue, we explained that "there was no need to mention the guilty pleas to deter any concern that Thomas was being singled out for prosecution." 998 F.2d at 1205. Moreover, even if the implication of selective prosection had become an issue, it could have been dealt with by instructing the jury that the issue of selective prosecution was not their concern. Id.

The trial court suggested a further reason to admit the plea -- to explain the witnesses' firsthand knowledge of the defendant's misdeeds. See United States v. Halbert, 640 F.2d 1000, 1005 (9th Cir. 1981). But a witness's guilty plea doesn't establish her basis of knowledge. The witness's testimony itself will establish that basis.

After the valid purposes for which the plea may be admissible are proffered, the trial court must balance the probative value of the testimony with its prejudicial effect. The standard for the balancing is that of Federal Rule of Evidence 403.6 That is, the prejudice that inures to the defendant by the admission of a co-conspirator's guilty plea may be overcome by its probative value. Furthermore, in some circumstances, a limiting instruction against the use of the plea as substantive evidence of defendant's guilt, as

_____

6. Fed. R. Evid. 403 provides:

    Although relevant, evidence may be excluded if its probative value is
    substantially outweighed by the danger of unfair prejudice,
    confusion of the issues, or misleading the jury, or by considerations
    of undue delay, waste of time, or needless presentation of
    cumulative evidence.

was given in this case, reduces that prejudice. United States v. Werme, 939 F.2d 108, 114 (3d Cir. 1991). However, in Gaev, we recognized that "there may be cases where the inference of guilt from the co-conspirator's plea agreement is sufficiently strong that even limiting instructions will not effectively contain it." 24 F.3d at 478. This is one of those cases.

Notwithstanding the limiting instruction here, the jury, having heard evidence accusing defendants of 39 counts of mail fraud and false claims, acquitted all 3 defendants on 38 of the counts. The only count of conviction was the one to which the government's star witness, Blum Bonjo, a mid-level employee, had pled guilty. In addition, the patient involved in Count One, Mildred Hynds, was also involved in four other counts on which defendants were acquitted. It would appear then that whether a particular patient needed treatment, at least in the Hynds case, was not a determining factor in the jury verdict. Moreover, the government has conceded in its cross-appeal that the conduct charged in the other 38 counts was virtually identical to the conduct charged in Count One. The evidence cited by the government, in arguing that there is sufficient evidence to support the convictions on Count One, is for a large part the same evidence that the jury heard and then found not to support conviction on 38 of the counts. There is, therefore, the strong possibility that Blum Bonjo's guilty plea to that count was considered by the jury as direct evidence against the defendants.

Concerning the probative value of the pleas, as we have described above, the proffered reasons for admitting the evidence were weak. Therefore, notwithstanding the discretion due a district court judge making an evidentiary determination, we find that the probative value of the pleas was substantially outweighed by the danger of unfair prejudice. Despite the fact that we have found sufficient evidence to support Lukesh and Universal's convictions, the evidence on the count of conviction was very similar to the evidence supporting the thirty-eight acquitted counts. In view of the fact that the only distinguishing evidence on the count of conviction is the consideration of the co-conspirators' guilty pleas, we must conclude that the denial

18

of defendants' motion in limine and the subsequent introduction at trial of evidence of Blum Bonjo's and Martin's guilty pleas was reversible error. We will reverse the judgment of conviction as regards Lukesh and Universal.7

CONCLUSION

For the reasons stated above, we will reverse the conviction of Attila Horvath for the insufficiency of the evidence against him and remand his case to the District Court for entry of a judgment of acquittal. We will reverse the convictions of defendants Lukesh and Universal and remand their cases to the District Court for a new trial.

_____

7. As regards Horvath, our holding that the post-verdict judgment of acquittal should have been granted renders moot his appeal of the denial of the motion in limine.

GARTH, Circuit Judge, dissenting:

The majority of the panel (my colleagues Judges Roth and McKee) have reviewed the record and reversed the conviction of the defendant Attila Horvath ("Horvath"), who had been charged with mail fraud in conducting a Medicare fraud scheme over a three-year period.[1]  In doing so, they have directed Horvath's acquittal on Count One[2] despite the credible evidence found against him by the jury and despite the District Court's application of the undeniably correct standard, under United States v. Glasser, 315 U.S. 60 (1942), which requires affirmance of a conviction so long as the verdict is supported by substantial evidence, with all reasonable inferences viewed in a light most favorable to the Government. That standard, to which this Court adheres, requires an affirmance of the defendants' convictions on this appeal.

A.

In light of the majority's rejection of the jury's verdict, which is tested by the Glasser standard just adverted to, and in light of an even more erroneous holding that completely eviscerates the deference which we are required to give to a District Court's discretionary ruling to admit pleas of codefendants,[3] I must respectfully dissent.

_____

1. The damage from Medicare fraud has been extensive. See, e.g., Medicare Contractors Aren't Pursuing Fraud, Audit Shows, USA TODAY, Dec. 2, 1998, at A1; Probers Allege Medicare Fraud by Columbia/HCA, CHICAGO TRIBUNE, Feb. 11, 1998, at N3 (disclosing investigation of nationwide Medicare fraud by large health care organization); Fraud and Waste in Medicare, N.Y. TIMES, Aug. 1, 1997, at A30 (stating government estimates approximately $23 billion per year lost to Medicare fraud).

2. Count One charged that Horvath, Lukesh and Universal violated 18 U.S.C. section 1341, which proscribes use of the mails in furtherance of a fraudulent scheme.

3. See General Elec. Co. v. Joiner, 522 U.S. 136 (1997) (recognizing, in context of expert testimony, that trial courts have discretion to admit such testimony, and rejecting standard that "fail[s] to give the trial court the deference that is the hallmark of abuse of discretion review"). A long line of cases from this Court has respected the District Court's discretion

20

B.

Indeed, I dissent not only from the majority's insistence on refusing the admission of the guilty pleas of codefendants Penny Martin and Judy Blum Bonjo on the record presented here, but I strongly urge the full court to grant en banc consideration to what can only be characterized as an aberration in our jurisprudence-- an aberration dictated in the first instance by the suspect holding in United States v. Thomas, 998 F.2d 1202 (3d Cir. 1993). In Thomas, in the face of a compelling and reasoned dissent by Judge Rosenn of this Court, our own precedents, decisions from our sister Circuits,4 and fully documented and detailed discretionary rulings by the District Court Judge, the same distorted result as to the exclusion of a plea agreement gave rise to the same miscarriage of justice that we now see here.

Our court -- the full court -- should undertake to clarify this significant aspect of our criminal jurisprudence by vacating the instant majority opinion, by rehearing the issue en banc, and by reaffirming the standard that Judge Scirica of this Court found appropriate in Gaev . It should re-align the Third Circuit on the correct and proper course, which provides for the acceptance of guilty pleas at trial by codefendants when the correct standard of a District Court's discretion is applied to the facts and when the proper purposes of credibility, selective prosecution and establishing firsthand knowledge are found, as they were unquestionably applied by the District Court and found here. Such a course would comport with the jurisprudence

_____

in admitting pleas of codefendants. See United States v. Gaev, 24 F.3d 473 (3d Cir.), cert. denied, 513 U.S. 1015 (1994); United States v. Gambino, 926 F.2d 1355 (3d Cir.), cert. denied, 502 U.S. 956 (1991); United States v. Newman, 490 F.2d 139 (3d Cir. 1974); United States v. Gullo, 502 F.2d 759 (3d Cir. 1974). Indeed, this Court has held repeatedly that admission of a plea, without more, is not ordinarily reversible. See, e.g., United States v. Restaino, 369 F.2d 544 (3d Cir. 1966).

4. See, e.g., United States v. Tse, 135 F.3d 200 (1st Cir. 1998); United States v. Casto, 889 F.2d 562 (5th Cir. 1989), cert. denied, 493 U.S. 1092 (1990); United States v. Louis, 814 F.2d 852 (2d Cir. 1987).

21

of our sister Circuits that have wisely, and in accord with prevailing legal standards, accepted such evidence.

Based on the record before us, I believe (1) that the evidence was sufficient to support Horvath's conviction, and (2) that the District Court did not abuse its discretion in admitting the codefendants' guilty pleas, and that the guilty pleas were admitted for a proper purpose and did not invalidate the convictions of all the defendants. Therefore, I would hold the majority's disregard of the District Court's rulings and its reversal of those convictions is unwarranted and violates both the District Court's and this Court's proper standards of review.

C.

Although not addressed in the majority opinion, see Majority Op. at 6 n.3, I further conclude that pursuant to the teaching of United States v. Watts, 519 U.S. 148 (1997), the District Court grievously erred in not considering acquitted and uncharged conduct pursuant to Section 2F1.1 of the Guidelines in calculating the Sentencing Guidelines range of each of the defendants.

Accordingly, I dissent from the majority's decision to remand Horvath's case to the District Court to enter a judgment of acquittal, and to reverse the convictions of Lukesh and Universal and remand for a new trial on Count One.

I

As the majority opinion notes, see Majority Op. at 6, Horvath, Lukesh and Universal appealed the denial by the District Court of their post-conviction motion for a judgment of acquittal, or in the alternative, a new trial. These defendants had moved for relief on the basis of insufficiency of the evidence and claimed that the admission of the codefendants' guilty pleas were unduly prejudicial.

Prior to that motion, however, these defendants had made an in limine motion to exclude testimony concerning the plea agreements entered into by the codefendants. The

22

District Court took the matter under advisement, accepted submissions by the parties and heard argument as to the applicable legal principles. The District Court, in its discretion, denied the motion, concluding that

> if [Bonjo and Martin] testify the jury is going to certainly wonder whether or not they have been charged. It's going to wonder perhaps what they have been promised by the prosecutor if anything and what they may be getting in return for their testimony.
>
> I think in weighing all of those factors with the possible prejudice that I am going to allow the Government to bring out the fact of the guilty plea and the fact of the guilty plea agreement.

The District Court considered the issue again after the conclusion of the trial. In denying these defendants' post-conviction motion, the District Court first noted that, in a motion challenging the sufficiency of the evidence, the court

> must view the evidence in the light most favorable to the government. A claim of insufficiency places a very heavy burden on the [defendants]. [The court] must affirm the convictions if a rational trier of fact could have found defendant[s] guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence.
>
> The mail fraud statute, 18 U.S.C. S 1341, proscribes any "scheme or artifice to defraud" in which the defendant participated with the specific intent to defraud and in which the mails were used "in furtherance of the fraudulent scheme." The scheme "need not be fraudulent on its face but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." Proof of specific intent is required, which "may be found from a material misstatement of fact made with reckless disregard for the truth." United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir. 1995) (citations omitted). Thus, a mail fraud conviction stands where the evidence demonstrates a defendant's willful participation in a scheme to defraud with knowledge of its fraudulent

23

nature. See United States v. Pearlstein, 576 F.2d 531, 537 (3d Cir. 1978).

In denying the motion, the District Court conducted a careful review of the evidence indicating a crime had been committed, and the evidence connecting each defendant to the crime. After outlining the testimony and documentation connecting Horvath and the other defendants to the crime charged in Count One, the District Court summarized the evidence as follows:

> In the instant case, the individual defendants' guilty knowledge could rationally be inferred beyond a reasonable doubt from (1) the active parts Horvath and Lukesh played in the daily operation of the speech therapy practice, (2) [d]efendants' knowledge and monitoring of Universal's billing problems -- the number of patient cases being billed and met with record requests, denials and increased scrutiny by Blue Cross . . . (3) the testimony of key administrators, Julia Blum Bonjo, Penny Martin and Wendy Gold, recalling how Horvath and Lukesh wanted patient documentation billable no matter what had to be done to it, and (4) the directives given to speech therapists by their supervisors, under tremendous pressure from Lukesh and Horvath, to pick up patients, even though inappropriate, to warrant skilled services, and to rewrite patient documentation to make patient services "billable" and reimbursable by Medicare.

The District Court found this evidence sufficient to support the jury's finding that a crime had been committed and that Horvath and Lukesh (and, through their actions, Universal) had the intent required under the mail fraud statute. Neither the appellants nor the majority have given any reason to question that conclusion by the District Court or the jury's verdict.

The District Court next addressed the issue of admission of the plea agreements. It reiterated its concern over selective prosecution, and noted as well that the testimony from Bonjo and Martin would assist the jury in assessing credibility. I believe that the majority has artfully finessed the issue of admitting the codefendants' guilty pleas,

24

without ever providing reasons or presenting evidence that the District Court had abused its discretion – indeed, without ever even holding that the District Court Judge did so. In so doing, the majority has not dealt fairly with the jurisprudence dealing with this subject, and has ignored a completely developed record. I thus turn first to the District Court's rulings admitting the guilty pleas. I do so observing that the admission of the guilty pleas at trial does not impact upon the other, independently sufficient evidence against the defendants.

II

The panel majority has reversed the Count One convictions of Lukesh and Universal because of the putative prejudicial effect that the introduction of Bonjo's and Martin's guilty pleas had at trial. Although the majority does not address this issue with respect to Horvath, it is obvious that the admission of the guilty pleas did not affect the other evidence presented to the jury to support Horvath's conviction. As the defendants were acquitted of thirty-eight (38) counts of the indictment but were convicted of the very count to which Bonjo pleaded guilty, defendants contend –– and the majority concurs–– that the guilty pleas were not admitted for a proper purpose and were so prejudicial that their admission constitutes reversible error. Majority Op. at 17-19.

I strongly disagree. In my view, the pleas of both Bonjo and Martin,5 after careful consideration and discussion in accordance with our requirements set forth in Gaev, were properly admitted. Even if not properly admitted, the evidence adduced at trial, combined with the curative instructions given by the District Court, rendered any error harmless. Indeed, the majority admits as much when it declares that the evidence against Lukesh and Universal is sufficient to support the jury's verdict. Majority Op. at 13-14.

_____

5. Bonjo was charged in the same indictment as Horvath, Lukesh and Universal. Martin, it appears from the record, was charged separately by information and pled guilty to one count of mail fraud.

25

The District Court, at the time of both Bonjo's and Martin's testimony, gave a curative instruction, advising the jury that the purpose for admitting testimony concerning their respective plea agreements was so that they could "adequately assess the credibility" of the testimony. The jury was also instructed that the jury was not to consider the plea agreements as evidence of the guilt of Horvath, Lukesh or Universal. The District Court, while charging the jury at the end of the trial, instructed the jury again, as follows:

> Julia Blum Bonjo and Penny Martin entered into plea agreements with the Government. Such plea agreements are expressly approved as lawful and proper by the United States Supreme Court and are appropriate, are proper. Each witness' decision to plead guilty is a personal decision about her own guilt. You may not consider this evidence against the defendants on trial nor may you draw any conclusions or inferences of any kind about the guilt of the defendants on trial from the fact that a prosecution witness pled guilty to similar charges.

> The testimony of such witnesses, as I indicated, should be scrutinized with caution and give it the weight that you think should be given under all of the circumstances.

> And I indicated to you during the trial that the fact that [Bonjo and Martin] entered pleas of guilty could not be considered by you in determining the guilt or innocence of any of the people on trial here. The only reason the plea and the plea agreement were brought out was so that you would know all of the circumstances surrounding the entry of the plea, you'd know the terms under which the plea was entered and you could judge for yourselves whether the witness in the trial is testifying truthfully or whether the witness has a motive to embellish testimony or vary from the truth.

> That is the only basis or the only reason why the plea and the plea agreement were admitted.

26

(Emphasis added.) This Court reviews a District Court's decision to admit evidence of plea agreements for abuse of discretion, and we have been directed in no uncertain terms to defer to that discretion. See Joiner, 522 U.S. at 136; Gaev, 24 F.3d at 476.

Although a co-conspirator's guilty plea cannot be used as substantive evidence of a defendant's guilt, evidence of a guilty plea or plea agreement may be introduced for other permissible purposes. Judge Rosenn, in a cogent analysis of this issue in United States v. Thomas, included as proper purposes "(1) to bolster the credibility of the co-conspirators as prosecution witnesses; (2) to quell the inference that the co conspirators were not punished and that [the defendants] w[ere] thus `singled-out' for punishment; and (3) to establish the basis for the co-conspirators'firsthand knowledge of the crime about which they testified. Each of these is a proper purpose for admitting a guilty plea." 998 F.2d at 1208 (Rosenn, J., dissenting). See also Gaev, 24 F.3d at 476; Gambino, 926 F.2d at 1363; United States v. Werme, 939 F.2d 109, 113 (3d Cir. 1991), cert. denied, 502 U.S. 1092 (1992); United States v. Inadi, 790 F.2d 383, 384 n.2 (3d Cir. 1986). To this list should be added the overarching principle that trial judges have broad discretion to admit testimony under Rule 403 that "discloses the purpose, knowledge or design of a particular person." Glasser, 315 U.S. at 80; cf. Joiner, 522 U.S. 136 (recognizing, in context of expert testimony, that trial courts have discretion to admit such testimony, to which this Court must defer). The mere admission of a plea is not ordinarily reversible. See, e.g., Restaino, 369 F.2d 544. Other Circuits have also held that admission of a plea by a co-conspirator is appropriate for purposes other than to persuade a jury of a defendant's guilt. See, e.g., Tse, 135 F.3d 200; Casto, 889 F.2d 562; Louis, 814 F.2d 852.

In Gaev, this Court summarized that the underlying principle concerning the admissibility of a plea agreement as follows: "If a co-conspirator who appears as a witness has pleaded guilty, the trier of fact should know about the plea agreement in order properly to evaluate the witness's testimony, unless that would unduly prejudice the defendant." 24 F.3d at 476 (emphasis added). Moreover, as

27

the credibility of the Government's witnesses normally is critical to the successful prosecution of a case, this Court has acknowledged that the strategic admission of a guilty plea "dampens attacks on credibility, and forecloses any suggestion that [the Government] was concealing evidence. Such disclosure is appropriate." Gambino, 926 F.2d at 1363.

Here, the District Court permitted the introduction of the guilty pleas because of credibility concerns that might arise in the minds of the jurors as to Bonjo's and Martin's testimony. In addition, the District Court determined that the admission of the guilty pleas would allay the jurors' concerns -- that might arise in the absence of such admission -- that Horvath and Lukesh were subjected to selective prosecution. In making these rulings, the District Court, following this Court's direction in Gaev, balanced the probative and prejudicial impact of the pleas. The District Court found that, as in Gaev, credibility was an issue because the witnesses' testimony was challenged, and that the limiting instructions cured any prejudice. Even more so than in Thomas, here the District Court found "specific issues of credibility" that warranted admission of the pleas.

These determinations were well within the District Court's discretion, and this Court must (and I emphasize the word must) accord the proper deference such rulings on admissibility by the District Court. Cf. Joiner, 522 U.S. 136 (finding discretionary decisions of trial court must be upheld in absence of manifest error).

A fair reading of the record reveals that the District Court admitted the pleas for a proper purpose, and the Government's limited use of the guilty pleas at trial caused no undue prejudice that would not have been corrected by the District Court's curative instructions. This is not a case in which the prosecution placed "undue emphasis" upon the pleas, Restaino, 369 F.2d at 545, to convince the jury of the defendants' guilt. Nor is this a case in which the curative instruction failed to advise the jury not to consider the admission of guilt by the witness against the defendants. See Newman, 490 F.2d 139; Gullo, 502 F.2d 759. Here, another co-defendant (Vicki Meitus) was acquitted of the charge alleged in Count One. This fact,

28

when combined with the curative instruction, more than amply supports the conclusion that admission of the pleas was not an abuse of discretion. See Restaino, 369 F.2d at 546.

Indeed, the majority at no point claims that the District Court Judge abused his discretion -- nor could it in light of the careful and detailed consideration that Judge Kelly gave to the evidence in accordance with this Court's direction in Gaev. See Appendix 1768-72; Memorandum of May 31, 1996 at 16-20. Nor does the majority point to any evidence in the record that could support a determination that the District Court abused its discretion.

The only reason I can discern that the majority gives in holding that the guilty pleas were not admitted for a proper purpose was because Horvath, Lukesh and Universal pledged not to raise the issue of the accomplices' guilty pleas. Majority Op. at 16-17. Thus, the majority concludes that there was no need preemptively to bolster the credibility of the witnesses with the admission of their guilty pleas because the defendants would not have attacked Blum Bonjo and Martin on credibility grounds.

In so holding, however, the majority totally ignores prior directions of this Court that guilty pleas can be admissible even in the absence of an attack on a witness' credibility. See Gambino, 926 F.2d at 1363 ("[E]ven in the absence of this attack [on the Government witness' credibility], the elicited testimony [i.e., the guilty plea] was proper here.") See also Thomas, 998 F.2d at 1208 (Rosenn, J., dissenting). As Gambino has not been overruled, it remains the rule in this Circuit. The absence of an attack on a witness's credibility is simply insufficient for a court to find that a judge abused his discretion in admitting the plea; here, the District Court cited Gambino in its post-trial ruling for precisely this proposition. To hold otherwise, as the majority does, not only presents a conflict with Gambino,[6] but it would for all time foreclose the government's admission of evidence of a guilty plea on direct examination of its witnesses by the preemptive promise by defense

_____

6. See Internal Operating Procedure 9.1 ("[N]o subsequent panel overrules the holding in a published opinion of a previous panel").

counsel not to question the witness concerning the plea. That rule is not the rule of this Circuit. See Gaev, 24 F.3d at 477–78 ("While plea agreements have often been admitted in response to actual or anticipated attacks on a witness's credibility, an attack is not always necessary to justify their introduction") (emphasis added).

I urge that the Court consider this issue en banc because the majority opinion here -- as the majority opinion did in Thomas, which concerned an almost identical set of facts -- in effect rules out the use of any guilty plea, without regard to the discretion of the District Court, so long as defense counsel promises not to question the witness concerning the plea. Thomas and the analysis of the majority in the present case, when seen through the lens of Gaev, Gambino, Newman, Gullo and Restaino, makes a mockery of the holdings in those cases. To resolve the conflict between these precedents and Thomas and this case, the Court as a whole should confront this issue.

III

The majority has concluded that the evidence presented at trial was insufficient to support the conviction of Horvath, Majority Op. at 12, although there was sufficient evidence to support the convictions of Lukesh and Universal. Majority Op. at 13–14. My reading of the record leads me to a contrary conclusion with regard to Horvath. Because I conclude that the jury's verdict can be easily sustained by the evidence produced at trial, and that the admission of Bonjo's and Martin's guilty pleas does not affect this conclusion, I would affirm the conviction of Horvath.

The District Court enunciated and applied the correct standard in reviewing a challenge to a jury verdict based on insufficiency of evidence. In reviewing a jury verdict, the court "must view the evidence in the light most favorable to the jury verdict and presume that the jury verdict properly evaluated credibility of the witnesses, found the facts, and draw rational inferences." United States v. Iafelice, 978 F.2d 92, 94 (3d Cir. 1992). A conviction must be sustained if the verdict is supported by substantial evidence, and all

reasonable inferences must be viewed in a light most favorable to the Government. Id. This Court must simply determine whether "the conclusion chosen by the fact finders was permissible." United States v. McGill, 964 F.2d 222, 230 (3d Cir. 1992), cert. denied, 506 U.S. 1023 (1992). If there is substantial evidence to support the verdict, we will not reverse even though this Court may have decided the case differently. United States v. Sain, 141 F.3d 463, 470 (3d Cir. 1998).

Despite the majority's emphasis upon the fact that much of the evidence that the District Court relied upon to link Horvath to the fraudulent scheme did not directly relate to the Hynds incident charged in Count One, the elements of mail fraud do not necessitate that a defendant participate in every act executed in furtherance of that scheme. As the District Court noted, relying on Pearlstein, 576 F.2d at 541, the jury can infer the requisite intent from circumstantial evidence.

To obtain a conviction under section 1341, the Government must establish (1) the existence of a scheme to defraud; (2) the participation by the defendant in the particular scheme charged with the specific intent to defraud; and (3) the use of the United States mails in furtherance of the fraudulent scheme. See United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994).

Here, the evidence showed that Horvath, the Director of Finance, and Lukesh, the Director of Operations, actively participated in the daily operations of Universal and worked closely together. Both knew that Universal was having difficulty with Independence Blue Cross in getting its speech therapy services reimbursed. In addition, the testimony from the Universal administrators (i.e., Martin, Blum Bonjo, and Wendy Gold) indicated that Horvath and Lukesh created a "coercion" culture in which pressure was placed upon Universal's employees to obtain reimbursement in any way possible.

Specifically, Gold testified that Horvath and Lukesh had placed her under enormous pressure to increase production, which included pressure to rewrite the patient documentation. Blum Bonjo testified that she met with

31

Horvath and Lukesh together weekly for discussions about cases in which Medicare denied reimbursement for the speech services rendered and also testified that Universal handled non-billable cases by rewriting patient documentation to make such treatment billable.

Similarly, Martin testified that Horvath said that "he wanted the documentation billable no matter what had to be done to it." Some of the cases were put on hold (meaning that they would not be submitted for billing) because they did not seem appropriate for billing to Medicare. Martin testified that when the number of claims on hold were high, Horvath instructed that the claims be billed without doctors' signatures. Further, Martin stated that the documentation had to be rewritten and altered and originals had to be destroyed in order to avoid discrepancies in the documentation. Finally, the District Court reviewed the evidence presented at trial and found that Horvath was very active in the daily operations of Universal from the outset of the scheme, and closely monitored the results of the speech therapy practice. Horvath, through his approval of Universal's "rewriting" policy, sanctioned the fraudulent scheme alleged in Count One, for which he was found guilty.

In my view, there is no question that the jury's verdict linking Horvath to the fraudulent scheme is supported by the record. There was sufficient evidence to convince the jury, and this Court should not "weigh evidence or determine the credibility of witnesses." United States v. Casper, 956 F.2d 416, 421 (3d Cir. 1992) (quoting Glasser, 415 U.S. at 80). Reversal for insufficiency of evidence should not be granted except where the failure of the prosecution is "clear." Id. That situation is not present here. See also United States v. Anderson, 108 F.3d 478, 480–81 (3d Cir. 1997) ( "Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict"); United States v. McGlory, 968 F.2d 309, 321 (3d Cir.), cert. denied, 506 U.S. 956 (1992).

The question, then, for the jury to answer was whether the evidence sufficiently established that Horvath was

32

connected to the conduct charged in Count One. The jury
determined that there was, and the record more than fairly
supports that determination.

IV

As the majority has reversed the convictions on all three
defendants, its opinion does not discuss the sentence
imposed by the District Court, which was the subject of the
government's cross-appeal. Although I would affirm the
respective convictions of Horvath, Lukesh and Universal, I
would reverse the District Court's sentence calculation
under the Sentencing Guidelines ("the Guidelines"), as
presumably the issue of uncharged and acquitted conduct
can arise again in this case.

The majority opinion, oddly enough, does not reflect the
sentences imposed upon the defendants. Let me do so. The
District Court sentenced Universal to two years' probation
and a $25,000 fine. Horvath and Lukesh were sentenced to
three years of probation each. Horvath was fined $10,000,
plus $705.20 in restitution. Lukesh was fined $15,000,
plus restitution of $705.20.

Under Section 1B1.3 of the Guidelines, a District Court
can consider relevant conduct when calculating a
defendant's guideline range whether or not that conduct
was formally charged. See United States v. Watts, 519 U.S.
148, 152-53 (1997); see also U.S.S.G. S 1B1.3 cmt. 1 ("The
principles and limits of sentencing accountability under
this guideline are not always the same as the principles
and limits of criminal liability. [T]he focus is on the specific
acts and omissions for which the defendant is to be held
accountable . . . rather than on whether the defendant is
criminally liable.") In addition, under Watts, a defendant's
guideline range is affected even by acquitted conduct, as
long as that conduct has been proved by a preponderance
of the evidence. See Watts, 519 U.S. at 156. See also United
States v. Cianci, 154 F.3d 106 (3d Cir. 1998); United States
v. Baird, 109 F.3d 856 (3d Cir. 1997) (finding conduct
uncharged pursuant to plea agreement may be considered
at sentencing).

33

Notwithstanding the Guidelines and Watts, at sentencing, the District Court declined to consider uncharged and acquitted conduct when calculating defendants' guidelines ranges. Instead, the District Court only considered the loss associated with the conviction obtained in Count One-- totaling $1,411.20 -- without explaining why it was not considering the uncharged and acquitted conduct that the Government sought to be included. I believe that this omission was an abuse of discretion.

While I conclude that the evidence proved that Horvath, Lukesh, and Universal could be held accountable for the relevant (i.e., uncharged or acquitted) conduct, at the very least, the District Court should have made findings of fact as to why it declined to consider that conduct in the calculation of the sentences of Horvath, Lukesh and Universal. See, e.g., E.C. Ernst, Inc. v. Koppers Co. Inc., 626 F.2d 324 (3d Cir. 1980) (remanding because District Court failed to make factual findings and thus this Court could not determine how District Court assessed evidence). The District Court merely identified the standard under Watts and its conclusion not to consider the relevant conduct without stating its reasons, stating "I find under the Watts case that the burden is preponderance of the evidence and decline to include that conduct in the specific offense characteristics."

Given that the District Court ruled in denying the post-conviction motion that there was substantial evidence to support the underlying conviction in Count One, I fail to understand how the District Court could conclude that the Government had not met its burden by a preponderance of the evidence of Horvath, Lukesh, and Universal's involvements in the other related counts of the very same scheme to defraud.

The inclusion of uncharged and acquitted conduct, which may have amounted to a total loss of $343,500, would have resulted in an increase of eight levels under the Guidelines. See U.S.S.G. S 2F1.1(I). Horvath had an offense level of 8, providing a guidelines range of 0-6 months, and Lukesh had an offense level of 10, providing a guideline range of 6-12 months. If uncharged and acquitted conduct were considered at sentencing, however, Horvath's sentencing

34

range could have increased to 21-27 months (i.e., to offense level 16) and Lukesh's range could have increased to 27-33 months (i.e., offense level 18).

Accordingly, I would hold the defendants accountable at sentencing for the uncharged and acquitted conduct with which they were involved in executing their fraudulent scheme.

V

In its opinion, the majority has reversed a jury verdict founded on sufficient evidence and has reversed detailed evidentiary rulings by the District Court. In doing so, the majority has violated four appellate strictures: 1) it has ignored our established standard of review under Glasser, which requires that all reasonable inferences be resolved in favor of the government in an appeal challenging sufficiency of the evidence; 2) it has substituted its own "jury verdict" for that of the enpanelled jury; 3) it has refused to give the required deference to a District Court Judge's discretionary rulings; and 4) it has perpetuated a jurisprudential conflict over the admission of codefendant guilty pleas at trial.

The trial transcript and post-conviction order reveal that the District Court carefully considered the arguments raised by the defendants, and rejected them in accordance with principles long established by prior panels of this Court. Under these circumstances, when the issues raised on appeal concern evidentiary issues addressed by the District Court in a careful analysis that considered the arguments for both sides, I am unable to agree that the District Court abused its discretion -- a claim that not even the majority justifies.

In sum, therefore, I cannot subscribe to the majority opinion because I believe that the guilty pleas were admitted for a proper purpose and because there was sufficient evidence to support Horvath's conviction. The evidence revealed an elaborate scheme of fraud on the medical insurance system of this country, which, although

35

not acknowledged by the majority, is a continuing problem that has cost our country dearly.7

I also conclude that the District Court erred in failing to state its reasons for not considering the uncharged and acquitted conduct of the defendants at sentencing.

Accordingly, I respectfully dissent.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____

7. See note 1, supra.